# HENRY WYSZOMIERSKI ET AL. *v.* FRANCIS SIRACUSA ET AL.
## (SC 18154)

Rogers, C. J., and Katz, Vertefeuille, Zarella and Schaller, Js.

Argued October 14, 2008—officially released January 27, 2009

*Patrick Tomasiewicz*, with whom, on the brief, was *Jonathan A. Cantor*, for the appellants (plaintiffs).

*Thomas W. Boyce*, with whom, on the brief, was *Jennifer Antognini-O'Neill*, for the appellees (defendants).

*Opinion*

ROGERS, C. J. In this medical malpractice dispute, the plaintiff, Mary Wyszomierski,[1] appeals from the judgment of the trial court in favor of the defendants, Francis Siracusa and Surgical Associates of Windham, P.C.[2] The primary issue in this appeal is whether the trial court abused its discretion in admitting certain of Siracusa's testimony regarding his treatment of the decedent, Henry Wyszomierski. The plaintiff also challenges the trial court's factual findings in its memorandum of decision. We conclude that the court did not abuse its discretion in admitting the challenged testimony and that the court's findings of fact were not clearly erroneous. Accordingly, we affirm the judgment of the trial court.

The following facts, as found by the trial court, are not in dispute. The decedent was born on July 5, 1932. He consumed alcohol regularly for many years, but abstained from alcohol completely after 1980. Despite his abstinence, he eventually developed early stage cirrhosis of the liver. In June, 1995, the decedent experienced an episode of chest pain and later was diagnosed with acute pancreatitis after tests revealed no evidence of cardiac problems.

On July 5, 2001, the decedent experienced another episode of pain in his chest and rib cage. The decedent's physician, Morton Glasser, diagnosed him with another episode of pancreatitis. Following his diagnosis, Glasser

---

[1] The plaintiff, individually, and her husband, Henry Wyszomierski, initiated this action together, alleging negligence and loss of consortium. After Henry Wyszomierski died on November 6, 2003, the plaintiff, in her capacity as executrix of the estate of Henry Wyszomierski, entered this action as a substitute plaintiff in place of the decedent, pursuant to General Statutes § 52-599. For simplicity, we refer to Mary Wyszomierski, in both her individual capacity and as executrix of Henry Wyszomierski's estate, as the plaintiff.

[2] Although the operative complaint also named Windham Community Memorial Hospital, Inc., as a defendant, the sole count against it was withdrawn on May 31, 2005, and it is not a party to this appeal. We refer to Siracusa and Surgical Associates of Windham, P.C., collectively as the defendants.

consulted with Siracusa, who is a board certified general surgeon and is licensed by the state of Connecticut.

On July 7, 2001, Siracusa examined the decedent at Windham Community Memorial Hospital (hospital), reviewed the decedent's medical records and obtained a medical history of the decedent from the plaintiff. Siracusa ordered a computed tomography (CT) scan and ultrasound to attempt to ascertain the cause of the decedent's recurring pancreatitis. Those tests revealed gallstones in the decedent's gallbladder, but no other abnormalities. Siracusa recommended a surgical procedure known as laparoscopic cholecystectomy to remove the decedent's gallbladder.[3] He further recommended performing a cholangiogram[4] during the cholecystectomy to disclose the presence of gallstones in the common bile duct.[5] On July 20, 2001, Siracusa met

[3] Laparoscopic cholecystectomy involves the insertion of trocars, sharply-pointed tubular instruments, through a series of small incisions in the patient's abdominal cavity. Through one of the trocars, an endoscope is inserted into the abdominal cavity to illuminate the area surrounding the gallbladder and transmit a visual image of the abdomen onto a monitor. Additional instruments are inserted through the other trocars to clamp the cystic duct, dissect the gallbladder, control bleeding and execute other procedures.

[4] A cholangiogram involves the injection of dye into the common bile duct. When the duct is observed through a fluoroscopic monitor, the dye discloses the presence of gallstones in the duct system.

[5] In its memorandum of decision, the court described the biliary duct system as follows: "The liver produces bile, a surfactant, which aids in the digestion of food, especially fatty food. The bile produced by the liver flows down the various hepatic ducts into the common hepatic duct, which itself merges with the cystic duct to form the common bile duct. The cystic duct descends from the gallbladder, which is nestled under the liver. The liver bile backs up through the cystic duct where the bile is stored in the gallbladder. When bile is needed for digestion, chemical signals from the brain trigger the gallbladder to contract and expel the stored bile back down the cystic duct into the common bile duct. The common bile duct merges with the pancreatic duct just above the sphincter of Oddi, which regulates the discharge of bile into the duodenum, which forms a conduit between the stomach and small intestines. The ejection of bile into the duodenum is through a fleshy protuberance that projects into the duodenal space and is known as the papilla or ampulla of Vater."

with the plaintiff and the decedent to discuss his recommendations. Glasser thereafter examined the decedent and declared him medically fit to undergo the recommended procedures.

The cholecystectomy and cholangiogram were performed in the hospital on July 25, 2001. The cholecystectomy proceeded uneventfully. When the gallbladder was dissected from the liver, the newly exposed surface of the liver appeared raw as expected, but retained its integrity, showing no fragmentation or unusual bleeding. Siracusa further observed that the decedent's liver was flexible and had only micronodular signs of cirrhosis.

During the surgery, the cholangiogram revealed a gallstone in the decedent's common bile duct. Siracusa's repeated attempts to flush the gallstone out of the biliary duct system and into the duodenum met with frustration. Eventually, Siracusa determined that an alternate technique, endoscopic retrograde cholangiopancreatography (ERCP) with a papillotomy,[6] would be more successful in eliminating the gallstone. Because Siracusa, as a general surgeon, was not trained to perform an ERCP, he recommended to the decedent that a gastroenterologist perform the procedure.

On July 30, 2001, a gastroenterologist performed the ERCP and papillotomy. During the procedure, he observed no gallstones or other abnormalities in the common bile duct and concluded that the gallstone detected by Siracusa had passed on its own.

For several days after the cholecystectomy and the ERCP, the decedent appeared to be recovering well.

---

[6] An ERCP involves the insertion of a duodenoscope into the duodenum through the mouth and stomach. From there, the duodenoscope can be used to identify and penetrate the papilla of Vater in order to observe the common bile duct and remove gallstones. In addition, a papillotomy may be performed whereby the papilla is incised, widening the point where the common bile duct discharges and allowing stones to pass more easily.

On August 5, 2001, however, his health began a steady decline. While at home, the decedent felt a sudden, severe abdominal pain on his right side, which radiated to his right shoulder. He subsequently was admitted to the intensive care unit and laboratory tests indicated an elevated white blood cell count and abnormal liver and kidney functioning.

Siracusa examined the decedent and recommended another laparoscopic procedure to identify the source of his symptoms. During that procedure, Siracusa detected some oozing from the crevice under the liver where the gallbladder had been removed and aspirated blood from all quadrants of the decedent's abdomen.

Following the procedure, the decedent's kidneys began to malfunction, and he eventually fell into a coma. By the middle of September, 2001, the decedent had resumed consciousness, but he continued to experience problems with his liver, kidneys and pancreas. Over the next several months, the decedent's cirrhosis became more advanced, and the disintegration of his liver cells caused fluid to build up in his abdomen, which required additional procedures. Liver and kidney complications persisted until November 6, 2003, when the decedent died from respiratory arrest caused by liver and kidney failure.

In an amended complaint dated August 10, 2004, the plaintiff alleged that the defendants negligently had caused the aforementioned decline in the decedent's health and his eventual death. Specifically, the plaintiff claimed that Siracusa failed to exercise reasonable care in his treatment of the decedent by, inter alia, recommending the cholecystectomy to the decedent without first referring the decedent to a gastroenterologist or performing an ERCP, failing to obtain informed consent from the decedent prior to performing the cholecystectomy, performing the cholecystectomy without a medical need to do so and without adequate training or

qualifications and lacerating the decedent's liver during the cholecystectomy.[7]

After a trial to the court, the court rendered judgment in favor of the defendants. The plaintiff appealed to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-2. Additional facts will be set forth as necessary.

## I

The plaintiff first claims that the trial court abused its discretion in admitting certain testimony by Siracusa after the court had granted her motion in limine to preclude the defendants from presenting expert testimony at trial.[8] We disagree.

---

[7] The court found that the plaintiff failed to sustain her burden of proof with respect to her claims that Siracusa's training was inadequate and that Siracusa had performed the cholecystectomy improperly by lacerating the decedent's liver. The plaintiff has not challenged those conclusions as a basis for this appeal.

[8] The parties dispute whether the challenged testimony of Siracusa, as the treating physician, constituted expert opinion that was subject to exclusion under Practice Book § 13-4 (4). There is some discrepancy on this issue in our case law. Compare *Wright* v. *Hutt*, 50 Conn. App. 439, 451, 718 A.2d 969 (holding that Practice Book § 13-4 [4] applies "with equal force to treating physicians as well as to independent experts" and that trial court properly precluded treating physicians from defining medical terms and explaining why they recommended certain procedures because such testimony was based on special skills or knowledge outside ordinary knowledge of jurors), cert. denied, 247 Conn. 939, 723 A.2d 320 (1998), with *Arnone* v. *Enfield*, 79 Conn. App. 501, 527, 831 A.2d 260 ("The test for determining whether a witness is an expert is whether the witness has any peculiar knowledge or experience, not common to the world, that renders his *opinion* of assistance to the trier of fact. . . . Despite the fact that [the witness' testimony] may be beyond the knowledge of ordinary jurors, that, in and of itself, did not make the substance of [the witness'] testimony, expert *opinion* testimony." [Citations omitted; emphasis in original.]), cert. denied, 266 Conn. 932, 837 A.2d 804 (2003). We need not resolve this inconsistency under the unique circumstances of this case, however, because the trial court's ruling on the motion in limine did not address what limits would be placed on the testimony of Siracusa as the treating physician. When the plaintiff subsequently raised that issue at trial, the court entered a specific order clearly delineating the scope of the testimony that Siracusa would be allowed to provide as opposed to a more general order precluding all expert testimony.

The following facts are pertinent to our discussion of the plaintiff's claim. On January 23, 2006, the plaintiff filed a motion in limine, pursuant to Practice Book § 13-4 (4),[9] to preclude the defendants from thereafter disclosing the names of expert witnesses who would offer expert testimony during the trial. She argued that any subsequent disclosure of expert witnesses and admission of expert testimony at trial would violate both the rules of practice and the court's scheduling order and would cause her undue prejudice. The court granted the plaintiff's motion in limine. The record does not provide any indication that the parties, at that time, addressed the scope of Siracusa's testimony at trial.

Trial began on April 4, 2006. Just before Siracusa testified as the only defense witness, the plaintiff, foreseeing the possibility that Siracusa might offer expert opinion during his testimony, orally requested the court to limit the scope of his testimony to matters "[within] the ken of the normal fact finder." Specifically, she sought to preclude Siracusa from providing explanations or justifications for his course of treatment of the decedent and any other matter beyond factual discussions or factual events. She argued that such testimony would fall within the scope of expert testimony and that it would prejudice her because, in light of the

---

[9] Practice Book § 13-4 (4) provides in relevant part: "Each defendant shall disclose the names of his or her experts . . . within a reasonable time from the date the plaintiff discloses experts, or, if the plaintiff fails to disclose experts, within a reasonable time prior to trial. If disclosure of the name of any expert expected to testify at trial is not made in accordance with this subdivision, or if an expert witness who is expected to testify is retained or specially employed after a reasonable time prior to trial, such expert shall not testify if, upon motion to preclude such testimony, the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party; or (B) will cause undue interference with the orderly progress of trial in the case; or (C) involved bad faith delay of disclosure by the disclosing party. . . . Nothing contained in this rule shall preclude an agreement between the parties on disclosure dates which are part of a joint trial management order."

court's ruling on her motion in limine and as a matter of pretrial strategy, she did not inquire into those matters during Siracusa's deposition.

The court observed that Siracusa's reasons for pursuing or not pursuing a course of treatment with the decedent "have been put in issue . . . because of the filing of a lawsuit, so there can't be . . . a claim that what's going on here works as surprise on the plaintiff." The court then ruled that Siracusa would be allowed to testify about his conduct and reasons for his actions during the course of his treatment of the decedent but would not be permitted to give opinions as to whether his actions met the proper standard of care. The court reasoned that such historical testimony as to Siracusa's conduct and reasoning would provide a cohesive story. The court further explained that "[e]very treating physician, of course, is allowed to testify as to what he observed and what he did, and every observation necessarily involves both a blend of sensory perception and some opinion. . . . [B]ut I think that does not fall within the preclusion of expert testimony . . . even though that is necessarily going to involve his background, training and experience. He's allowed to give opinions that are perceptions . . . ." Siracusa subsequently testified consistent with the court's ruling.

"The court's decision on whether to impose the sanction of excluding [an] expert's testimony . . . is not to be disturbed unless it abused its legal discretion, and [i]n determining this the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *Cavallaro v. Hospital of Saint Raphael*, 92 Conn. App. 59, 66, 882 A.2d 1254, cert. denied, 276 Conn. 926, 888 A.2d 93 (2005).

In *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 9–11, 776 A.2d 1115 (2001), we "recognized that, apart from a specific rule of practice authorizing a sanction, the trial court has the inherent power to provide for the imposition of reasonable sanctions, to compel the observance of its rules. . . . Our trial courts have the inherent authority to impose sanctions against an attorney and his client for a course of claimed dilatory, bad faith and harassing litigation conduct, even in the absence of a specific rule or order of the court that is claimed to have been violated. . . .

"In addition, our rules of practice, adopted by the judges of the Superior Court in the exercise of their inherent rule-making authority . . . also [provide] for specific instances in which a trial court may impose sanctions. For example, Practice Book § 13-14 (a) provides that, in general terms, if a party fails to comply with certain discovery obligations, the court may, on motion, make such order as the ends of justice require, including entry of an order establishing as a fact the matters in question, prohibiting the entry into evidence of designated matters, entry of a default, nonsuit or dismissal, and an award of costs and attorney's fee. Furthermore, Practice Book § 13-4 (4) . . . provides that, in general terms, if a party fails timely to disclose the name and substance of the opinion of an expert whom the party expect[s] to call [as] an expert witness at trial, the court may, upon motion . . . preclude such testimony . . . ." (Citations omitted; internal quotation marks omitted.)

The purpose of Practice Book § 13-4 (4) is to assist the parties in the preparation of their cases, and to eliminate unfair surprise by furnishing the opposing parties with the essential elements of a party's claim. See *Wexler* v. *DeMaio*, 280 Conn. 168, 188–89, 905 A.2d 1196 (2006). Section 13-4 (4) authorizes the court to preclude expert testimony "[as a] sanction for late dis-

closure of an expert witness on a motion of the opposing party if the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party; or (B) will cause undue interference with the orderly progress of trial in the case; or (C) involved bad faith delay of disclosure by the disclosing party." (Internal quotation marks omitted.) *Hicks* v. *State*, 287 Conn. 421, 444, 948 A.2d 982 (2008).

In order for a trial court's order of sanctions for violation of a discovery order to withstand scrutiny, three requirements must be met: "First, the order to be complied with must be reasonably clear. . . . Second, the record must establish that the order was in fact violated. . . . Third, the sanction imposed must be proportional to the violation." (Internal quotation marks omitted.) *Wexler* v. *DeMaio*, supra, 280 Conn. 179; *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 17–18. There is no dispute that, in the present case, Siracusa was not disclosed timely as an expert witness, which was a violation of the court's scheduling order and Practice Book § 13-4 (4). Accordingly, we limit our discussion to the propriety of the court's sanction in response to Siracusa's violation. This "poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Internal quotation marks omitted.) *Wexler* v. *DeMaio*, supra, 179; *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 17–18.

In the present case, the trial court precluded Siracusa from presenting at trial an independent expert to testify as to the proper standard of care. The court further limited Siracusa's testimony to his conduct and the reasons for his actions as the treating physician. Siracusa also was not allowed to testify as to the proper standard of care. The plaintiff, however, requested that the court impose the additional sanction of precluding Siracusa from testifying regarding his reasoning in pur-

suing the particular course of treatment that he had chosen for the decedent.[10] In response, the court noted that the plaintiff had raised Siracusa's reasoning as a central issue in this case. The court therefore rejected the plaintiff's claim that unfair surprise and prejudice would result from Siracusa's testimony regarding his thought processes during his treatment of the decedent.[11] Affording the court every reasonable presumption in favor of its ruling, we conclude that the court did not abuse its discretion in denying the plaintiff's requested sanction.[12]

---

[10] In reviewing whether the sanction imposed was proportional to the violation, this appeal is unusual in that it addresses whether a sanction was severe enough, as opposed to the vast majority of appeals, which review whether a sanction was too draconian. See, e.g., *Viera* v. *Cohen*, 283 Conn. 412, 456–58, 927 A.2d 843 (2007); *Cavallaro* v. *Hospital of Saint Raphael*, supra, 92 Conn. App. 64–72; but cf. *Hicks* v. *State*, supra, 287 Conn. 442–45 (no abuse of discretion where court determined that defendant not prejudiced by plaintiff's untimely disclosure); *Cafro* v. *Brophy*, 62 Conn. App. 113, 117–21, 774 A.2d 206 (court abused its discretion in allowing plaintiff's expert to testify in rebuttal where defendant prejudiced by disclosure of expert near end of defendant's case), cert. denied, 256 Conn. 933, 776 A.2d 1149 (2001).

[11] The plaintiff did not raise, and the court did not find, either of the alternate reasons for precluding Siracusa's testimony; i.e., undue interference with the orderly progress of trial or bad faith delay. See Practice Book § 13-4 (4); see also *Narumanchi* v. *DeStefano*, 89 Conn. App. 807, 810, 875 A.2d 71 (2005).

[12] The plaintiff also claims that the court, notwithstanding its ruling, improperly relied on Siracusa's testimony to establish the standard of care. First, the plaintiff argues that, during the direct examination of Siracusa, the court improperly permitted both Siracusa and his counsel to use the word "contraindicated" because that word "had the ring of standard of care testimony." We disagree. The word "contraindicate" simply means "to make (a treatment or procedure) inadvisable." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993); see also Stedman's Medical Dictionary (27th Ed. 2000) (contraindication is "[a]ny special symptom or circumstance that renders the use of a remedy or the carrying out of a procedure inadvisable"). The court unequivocally limited Siracusa's testimony, pursuant to its sanction, to his historical assessment of the advisability of performing a laparoscopic cholecystectomy on the decedent, and did not allow him to testify as to whether certain observations would have rendered laparoscopic cholecystectomy inadvisable under the appropriate standard of care. Accordingly, we reject the plaintiff's argument that testimony regarding contraindications implicated the relevant standard of care.

## II

The plaintiff's remaining claims challenge three factual findings in the court's memorandum of decision. Specifically, the plaintiff claims that the court improperly found that: (1) Siracusa and the plaintiff's expert agreed, with one exception, that Siracusa's advice with respect to the cholecystectomy did not breach the appropriate standard of care for informed consent; (2) the aforementioned exception did not cause the decedent's injuries; and (3) a subordinate fact that was not supported by the evidence had informed the expert's opinion that the cholecystectomy likely was unnecessary. We are not persuaded.

Before we address each of the plaintiff's claims in turn, we recite our standard of review. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . Although we give great deference to the findings of the trial court because of its function

---

Second, the plaintiff argues that the court relied on Siracusa's testimony to establish that there were "four realistic, potential causes which could have accounted for the decedent's pain on July 5, 2001." Although the plaintiff correctly notes that Siracusa's testimony reflects four potential sources for the decedent's pain, the plaintiff's expert, Irvin Modlin, acknowledged all four of the potential sources identified by Siracusa at various points throughout his testimony, but ultimately concluded that two of those sources had been eliminated subsequent to July 5, 2001. We presume that the court relied on Modlin's testimony, rather than Siracusa's, as a basis for its factual finding that the decedent's pain, in fact, had four possible sources. See *St. Germain* v. *LaBrie*, 108 Conn. App. 587, 596 n.3, 949 A.2d 518 (2008) (absent indication in record to contrary, we presume court acted properly in performance of its duties). Accordingly, we reject the plaintiff's claim that the court violated its own ruling by relying on Siracusa's testimony to establish the relevant standard of care.

to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . we will not uphold a factual determination if we are left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Cardinal Realty Investors, LLC* v. *Bernasconi*, 287 Conn. 136, 139–40, 946 A.2d 1242 (2008). "In applying the clearly erroneous standard of review, [a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . This distinction accords with our duty as an appellate tribunal to review, and not to retry, the proceedings of the trial court." (Citation omitted; internal quotation marks omitted.) *First National Bank of Litchfield* v. *Miller*, 285 Conn. 294, 302–303, 939 A.2d 572 (2008).

A

The plaintiff first challenges the court's finding that, with one exception, her expert, Irvin Modlin, agreed that Siracusa's July 20, 2001 consultation with the decedent adequately had informed the decedent of the risks, benefits and alternatives to cholecystectomy. Specifically, the court found: "As to the particular risks, benefits, and alternatives which the court has found Siracusa did relate to the decedent on July 20, 2001 . . . Modlin agreed the advice was proper with the exception that an ERCP ought to have been discussed as a viable alternative before laparoscopic surgery." The plaintiff claims that the court's finding is clearly erroneous because Modlin's testimony did not agree with that of Siracusa. She argues that Modlin's description of the risks, benefits and alternatives to cholecystectomy described a much more "dark and gloomy picture" than

that painted by Siracusa's testimony.[13] The defendants argue that the word "agreed" in the trial court's memorandum of decision merely expressed the court's conclusion that Siracusa had met the standard of care for informed consent articulated by Modlin. We agree with the defendants.

In addressing the plaintiff's claim that Siracusa had failed to obtain informed consent from the decedent, the trial court first acknowledged the lay standard for

---

[13] Specifically, the plaintiff quotes the following testimony by Modlin: "I would have explained to [the decedent] that he had pancreatitis and he had gallstones and that the pancreatitis could have been due to either alcohol or due to stones, and I didn't know which. I would have then told him that removing the gallbladder was an option if we could demonstrate the gallbladder was putting stones into the common bile duct causing his pancreatitis, but there was no way I could establish that without getting another procedure undertaken, an ERCP. I would have then explained to him that perhaps the ERCP is the procedure of choice even if he has got stones causing the pancreatitis because the mortality and morbidity of operating on him with his cirrhosis is fifty to a hundred fold greater than by doing it with a noninvasive method through the mouth. . . .

"I would have told him that his liver was likely to fail and that he would develop acute hepatic decompensation. I would have told him he was likely to bleed because his liver didn't make the right blood products. I would have told him that he was also more than likely to bleed because his spleen was involved in the portal hypertension and didn't make enough platelets to stop the coagulation. I would have told him that the risk of him getting septic after was much greater because of his cirrhosis, and I would have also told him that I couldn't be sure that removing the gallbladder would cure him because I didn't know if the gallbladder was the cause, so I would have painted a very dark and gloomy picture to him so that I could send him to see a hematologist or a gastroenterologist who did ERCP papillotomy. . . .

"I would have explained to him that his kidneys were linked to his liver and that if the liver started to fall down the side of the mountain, the kidneys would go with it. . . .

"I think it would be one lengthy discussion probably followed by a second lengthy discussion once he had been to see the consulting physician who would have to put the alternative viewpoints to him so he could have a balanced perspective and be a very substantial discussion because we're talking here about not the possibility of a little bit of a hematoma or a little bit of pain or a little bit of sepsis, we're talking about death."

establishing the necessary extent of disclosure.[14] The court then set forth the details of Siracusa's conversation with the decedent, explaining the nature of a cholecystectomy and the risks, benefits and alternatives to that procedure.[15] Finally, the court found that Modlin "agreed" that Siracusa's advice, with one exception,[16] was proper. In this context, the implication of the court's finding of agreement between Siracusa and Modlin is that Modlin's testimony established a standard of

[14] The lay standard "requires a physician to provide the patient with the information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy." (Internal quotation marks omitted.) *Janusauskas* v. *Fichman*, 264 Conn. 796, 810, 826 A.2d 1066 (2003). That information must include an adequate description of: "(1) the nature of the procedure; (2) the risks and hazards of the procedure; (3) the alternatives to the procedure; and (4) the anticipated benefits of the procedure." *Alswanger* v. *Smego*, 257 Conn. 58, 67–68, 776 A.2d 444 (2001).

[15] Specifically, the court stated: "Siracusa testified that he explained to the decedent the details of the laparoscopic surgery, which he recommended. He described for the [decedent] the benefits of laparoscopic gallbladder removal and the cholangiogram, i.e., removal of the probable source of the decedent's pancreatitis. [Siracusa] indicated to the decedent that this source was gallstones in the common bile duct, a condition that would recur if the gallbladder were not removed. Pancreatitis can be very serious and even fatal if left untreated. He recommended laparoscopic surgery over open surgery because it is less invasive, causes less bleeding, has a shorter recovery period and produces a less painful recovery requiring less medication.

"[Siracusa] also testified that he told the decedent of the risks of the laparoscopic procedure, [namely] infection, bleeding, unintended penetration of surrounding tissue and the use of anesthesia. He testified he specifically warned the decedent that he might have to convert the laparoscopic surgery to open surgery during the procedure if the decedent's cirrhotic liver warranted such conversion.

"The court finds [Siracusa's] testimony credible in this regard . . . . [His] notes confirm that he discussed the proposed procedure and its risks, benefits and alternatives with the decedent on July 20, 2001. Also, the decedent signed a consent form acknowledging the same. . . . [I]t was the practice of the decedent and the plaintiff simply to sign the forms and agree to whatever course of treatment the doctors recommended. In other words, the decedent and the plaintiff had no interest in learning of these matters and acted under the rubric that doctor knows best."

[16] The court found that Siracusa's failure to discuss an ERCP as an alternative to cholecystectomy breached the standard of care.

care that Siracusa met with one exception. In other words, the court determined that a reasonable patient, in deciding whether to consent to the cholecystectomy, would have considered adequate the information provided by Siracusa, and that the "dark and gloomy" details articulated by Modlin were superfluous. The court's findings as to the standard of care and that Siracusa had met that standard are supported adequately by the testimony of both Siracusa and Modlin, and, accordingly, we conclude that those findings are not clearly erroneous.

## B

The plaintiff next claims that the trial court improperly determined that Siracusa's failure to discuss the ERCP as an alternative to cholecystectomy did not proximately cause the decedent's injuries. Specifically, she claims that she had proven by a preponderance of the evidence that an objective and prudent patient in the decedent's position would have elected the ERCP over the cholecystectomy if such an alternative had been discussed. In support of her claim, she argues that the decedent would have elected the ERCP if Siracusa adequately had informed him of the risks of cholecystectomy.[17] We are not persuaded.

As we concluded in part II A of this opinion, the trial court properly found that the decedent, in fact, had

[17] The plaintiff also argues that the court improperly found that "referral to a specialist was not necessary nor required." Our review of the court's memorandum of decision, however, reveals that the court drew no such conclusion. If anything, the court drew the opposite conclusion, namely, that Siracusa should have referred the decedent to a specialist to discuss the ERCP before performing the cholecystectomy. The court found that, after the cholecystectomy, Siracusa, who was not trained to perform an ERCP, referred the decedent to a gastroenterologist to perform the procedure. In light of that finding, the court's conclusion that "[a] reasonable patient in the decedent's position would have found it material to know that [ERCP] existed" carries with it the implication that the decedent would have had to discuss that procedure with a specialist. Accordingly, we reject this argument.

received adequate information regarding the risks of cholecystectomy. In light of that conclusion, the plaintiff's claim is merely a second attempt to attack the court's factual findings with respect to proximate cause. See *Hammer* v. *Mount Sinai Hospital*, 25 Conn. App. 702, 711–12, 596 A.2d 1318 (adopting objective test for proximate cause in informed consent cases: "what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance" [internal quotation marks omitted]), cert. denied, 220 Conn. 933, 599 A.2d 384 (1991). As the plaintiff concedes in her brief, there is evidence to support the court's finding that the decedent, even if he had been informed adequately about the ERCP, would not have elected that procedure over the cholecystectomy. We conclude, therefore, that the court's finding is not clearly erroneous.

## C

The plaintiff's final claim is that the trial court improperly failed to credit Modlin's opinion that, if the decedent had received an ERCP prior to the cholecystectomy, the former procedure would have eliminated the need for the latter. Specifically, she contends that the court improperly rejected Modlin's expert opinion on the basis of the court's improper finding that Modlin's opinion was based on subordinate facts that were not supported by the evidence. The plaintiff contends that the trial court was incorrect in finding that Modlin's opinion was rooted in a factually unsupported assumption that an ERCP conducted before the cholecystectomy would have revealed an absence of gallstones in the decedent's common bile duct. After thoroughly reviewing the record, we conclude that the court's rejection of Modlin's opinion was not clearly erroneous.

The following discussion in the court's memorandum of decision provides the foundation for the plaintiff's

claim. "Modlin opined that it was beneath the standard of care for [Siracusa] to attempt a laparoscopic gallbladder removal before an ERCP had been done to discern whether the decedent's pancreatitis was the product of gallstones in the common bile duct or was alcohol-induced. . . . [Modlin] . . . concludes that the results of the ERCP and papillotomy would have eliminated gallstones as a source of the decedent's pancreatitis obviating the need for gallbladder removal in a patient with an elevated risk of uncontrolled bleeding because of cirrhosis of the liver. . . .

"Under his theory, the ERCP would have generated a diagnosis of alcohol-induced pancreatitis which would have rendered the known presence of stones in the gallbladder irrelevant and the extraction of the gallbladder unnecessary. *The flaw in his theory is an assumption that because the ERCP conducted on July 30, 2001, showed no gallstone in the common bile duct, an ERCP performed earlier would have also disclosed the absence of such stones.* The court rejects the validity of this assumption.

"If an ERCP had been done on or near July 25, 2001, or earlier, it would have detected the gallstone in the common bile duct which the cholangiogram that [Siracusa] executed on July 25, 2001, definitively disclosed existed there on that date. Detection of that gallstone in the common bile duct, by whatever technique, would have left the issue of whether the decedent's recurring pancreatitis was gallstone or alcohol-related ambiguous." (Emphasis added.)

We recognize that "[i]t is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Internal quotation marks omitted.) *In re*

*Davonta V.*, 285 Conn. 483, 489, 940 A.2d 733 (2008). The trier may not, however, "arbitrarily disregard, disbelieve or reject an expert's testimony in the first instance. . . . There are times . . . that the [fact finder], despite his superior vantage point, has erred in his assessment of the testimony. . . . Where the trial court rejects the testimony of a plaintiff's expert, there must be some basis in the record to support the conclusion that the evidence of the [expert witness] is unworthy of belief." (Citations omitted; internal quotation marks omitted.) *Builders Service Corp.* v. *Planning & Zoning Commission*, 208 Conn. 267, 294, 545 A.2d 530 (1988). In this case, "[w]here the factual basis of an opinion is challenged the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value." (Internal quotation marks omitted.) *State* v. *Douglas*, 203 Conn. 445, 452–53, 525 A.2d 101 (1987).

After reviewing the transcripts in this case, we conclude that the court's rejection of Modlin's opinion was not clearly erroneous because Modlin offered an opinion that was based on a fact that had no support in the evidence. Specifically, Modlin testified that the vast majority of patients who undergo the ERCP and papillotomy *and in whom no stones are discovered* requires no further intervention.[18] The undisputed testimony pre-

---

[18] During direct examination by the plaintiff's counsel, Modlin testified as follows:

"Q. Now . . . if the ERCP was selected in accordance with the standard of care in July of 2001, as the first procedure and the patient was suffering from increased amylase and lipase level which corresponds to gallstone pancreatitis, let's *assume* the ERCP found no stones, as [the gastroenterologist's] procedure determined. What would have happened. What would you do?

"A. Would have done exactly the same. Would have done the diagnostic ERCP to make sure there were no stones, found nothing, and would have done a papillotomy in case any stones were to subsequently come down from the gallbladder later . . . . The vast majority of these patients never require any further intervention again." (Emphasis added.)

sented during the trial, however, was that a gallstone had been found at about the time that an ERCP would have been performed. In addition, Modlin never opined that the cholecystectomy would have been avoided if a prior ERCP had found a gallstone. Accordingly, the court reasonably concluded that the plaintiff had failed to meet her burden of proving that an ERCP would have eliminated the need for a cholecystectomy.[19] Having identified a basis in the record for the court's factual findings, we conclude that those findings were not clearly erroneous.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[19] The plaintiff argues that, upon rejecting Modlin's testimony, the court, without any evidentiary support, improperly drew the conclusion that the ERCP would not have eliminated the need for the cholecystectomy. We disagree that the court reached such a conclusion. The court simply was "unpersuaded that the performing of an ERCP, more probably than not, would have eliminated the need for [a cholecystectomy]." The plaintiff's argument fails to acknowledge the difference between the failure to draw a particular conclusion and the embrace of an opposite conclusion.