******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# JACQUELINE EPRIGHT v. LIBERTY MUTUAL INSURANCE COMPANY
## (SC 20751)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

The plaintiff in error, B Co., a law firm that represented E in a civil action
to recover underinsured motorist benefits from the defendant in error
insurance company, L Co., filed a writ of error, claiming that the trial
court had improperly imposed sanctions, which required B Co. to pay
all of the costs related to L Co.'s retention of D, an orthopedic surgeon
who had been retained and disclosed by L Co. to provide expert testi-
mony in E's civil action. L Co. had disclosed in the civil action that D
would opine that E's shoulder injury was not related to the underlying
motor vehicle accident. During his deposition, however, D indicated
that he could change his opinion if he learned certain additional facts.
Subsequently, without informing L Co.'s counsel, B Co. scheduled an
appointment for D to perform a medical examination on E and filed its
own expert disclosure, indicating that E would call D as her own expert
witness in the civil action and that D was expected to testify that E's
shoulder injury was a direct result of the accident. After D's examination
of E, B Co. sent L Co. a copy of D's medical report, in which D opined
that E's shoulder injury was causally related to the accident. The trial
court thereafter disqualified D from testifying at trial and, due to the
purported violation of the rule of practice (§ 13-4) governing expert
discovery, ordered B Co. to compensate L Co. for the expenses L Co.
had incurred in retaining D for his expert services. Specifically, the trial
court concluded that sanctions for the violation of a discovery order
or rule were appropriate because Practice Book § 13-4 was clear, that
rule was in fact violated, and the sanctions imposed were proportional
to the violation at issue. This court transferred the writ of error to
the Appellate Court, which reversed the trial court's order imposing
sanctions on B Co. on the ground that § 13-4 did not clearly prohibit
ex parte communications between an attorney and an opposing party's
disclosed expert witness. On the granting of certification, L Co. appealed
to this court.

*Held* that the Appellate Court correctly concluded that the trial court had
improperly imposed sanctions on B Co. for conducting ex parte commu-
nications with an expert witness previously disclosed by L Co. because
it was not reasonably clear that Practice Book § 13-4 prohibits a party's
attorney from engaging in ex parte communications with another party's
disclosed expert witness:

The text of Practice Book § 13-4 did not contain an explicit prohibition on ex parte communications with an expert witness disclosed by an opposing party, and, when the judges of the Superior Court, in enacting various rules of practice, have intended to limit a lawyer's ex parte communications, they have explicitly done so.

Moreover, not only was Practice Book § 13-4 not explicit with respect to the permissibility of ex parte communications with a disclosed expert witness, but the history of § 13-4 demonstrated that it was not reasonably clear that such communications are prohibited, as, prior to 2009, § 13-4 expressly limited communications with an opposing party's disclosed expert to interrogatories and formally noticed depositions, whereas the present version of § 13-4 no longer includes that limiting language, and, accordingly, this court could not say that the current rule restricts communications with an opposing party's expert witness.

Furthermore, comparing how Practice Book § 13-4 deals with disclosed expert witnesses and nontestifying experts further supported the conclusion that the rule was not reasonably clear that it prohibited ex parte communications with disclosed experts, as the provision concerning discovery of nontestifying experts' opinions contains express language limiting ex parte communications to two identified scenarios, it was reasonable to presume that, when the drafters included limiting language in one section but omitted it in the other section, they did so intentionally, and the difference in treatment between disclosed expert witnesses and nontestifying experts was reasonable based on their different roles in the litigation process.

This court declined L Co.'s invitation to exercise its supervisory authority over the administration of justice to clarify that ex parte contact with an opposing party's disclosed expert witness is impermissible, as this court could not conclude that the conduct at issue so implicated the fundamental fairness and integrity of the judicial system as a whole, especially when other jurisdictions permit such ex parte contact and when solutions to such conduct exist under the present law.

Argued November 13, 2023—officially released July 11, 2024*

*Procedural History*

Writ of error from an order of the Superior Court in the judicial district of Middlesex, *Frechette, J.*, granting a motion for sanctions filed by the defendant in error with this court, and transferred to the Appellate Court, *Alvord, Moll* and *Sheldon, Js.*, which reversed the trial

---

* July 11, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

court's order and remanded the case to that court with direction to deny the motion for sanctions, and the defendant in error, on the granting of certification, appealed to this court. *Affirmed.*

*Jack G. Steigelfest*, for the appellant (defendant in error Liberty Mutual Insurance Company).

*Mario Cerame*, for the appellee (plaintiff in error Brignole, Bush & Lewis, LLC).

*Opinion*

MULLINS, J. This case requires us to consider whether, under Practice Book § 13-4, an attorney may be sanctioned for engaging in ex parte communications with an expert witness who has been retained and disclosed by the adverse party for the purpose of providing testimony in litigation. The defendant in error, Liberty Mutual Insurance Company (Liberty Mutual), appeals from the judgment of the Appellate Court, which reversed the trial court's order imposing sanctions on the plaintiff in error, Brignole, Bush & Lewis, LLC (firm), the law firm representing the plaintiff, Jacqueline Epright, in the underlying underinsured motorist action brought by Epright against Liberty Mutual.[1] The trial court imposed monetary sanctions after finding that attorneys with the firm engaged in impermissible ex parte communications with Liberty Mutual's expert witness, James Depuy, an orthopedic surgeon retained and disclosed by Liberty Mutual to provide testimony regarding damages and causation. The trial court determined that the firm's communication with Depuy was a clear violation of the rules of expert discovery set forth in § 13-4. The

---

[1] More specifically, the Appellate Court reversed the trial court's order imposing sanctions and remanded the case with direction to deny the defendant in error's motion for sanctions. See *Epright* v. *Liberty Mutual Ins. Co.*, 212 Conn. App. 637, 662, 276 A.3d 1022 (2022). Although the Appellate Court did not expressly say so, it effectively granted the writ of error filed by the plaintiff in error.

Appellate Court reversed the order of the trial court, concluding that § 13-4 does not clearly prohibit ex parte communication between an attorney and an opposing party's disclosed expert witness. We agree and, accordingly, affirm the judgment of the Appellate Court.

We begin by setting forth the relevant facts and procedural history. This appeal arose from an action brought by Epright seeking to recover underinsured motorist benefits from Liberty Mutual in connection with a motor vehicle collision. Epright allegedly sustained multiple injuries, including an injury to her left shoulder. During her deposition, Epright testified that she had experienced shoulder pain since the date of the accident.

Pursuant to Practice Book § 13-4, Liberty Mutual filed a disclosure identifying Depuy as an expert witness. The disclosure reported that Depuy was expected to testify, on the basis of his review of Epright's medical records, concerning his opinions about the nature, extent, and cause of Epright's injuries. Of particular relevance to the issue on appeal, the disclosure stated that Depuy's opinion was that the medical treatment Epright received with respect to her left shoulder was not related to the motor vehicle accident. Liberty Mutual later supplemented the initial disclosure with an addendum reporting that Depuy would also testify that Epright did not complain of shoulder pain until several months after the accident.

After Liberty Mutual filed the addendum, Kevin Brignole, an attorney working for the firm, deposed Depuy. During the deposition, Depuy stated that he had reviewed all of Epright's medical records and that they contained no indication that Epright complained of shoulder pain until well after the accident. Thus, Depuy concluded that Epright's shoulder injury was unrelated to the accident. Kevin Brignole then asked Depuy whether it would change his opinion if Depuy learned that Epright in fact

had been complaining of shoulder pain since the date of the accident, to which Depuy responded that such information might change his opinion. Kevin Brignole also asked Depuy if he had been provided with a copy of Epright's deposition before rendering his opinions. Depuy stated that he had not.

Subsequently, without informing counsel for Liberty Mutual, Timothy Brignole, another attorney at the firm, instructed his paralegal, Sandra H. Bryan, to contact Depuy's office to schedule an appointment for Depuy to perform a medical examination on Epright for a fee. Timothy Brignole was within earshot of Bryan when she spoke with Depuy's secretary and scheduled the examination. That same day, Kevin Brignole filed a detailed expert disclosure with the trial court, indicating that Epright intended to call Depuy as an expert witness, and Timothy Brignole sent the disclosure to the general e-filing address of Liberty Mutual's counsel. The disclosure stated that Depuy was expected to testify, inter alia, that the injuries to Epright's shoulder were the direct result of the motor vehicle accident.[2] Timothy Brignole then sent Depuy copies of Epright's deposition transcripts and a letter memorializing the scheduling of the appointment.

Thereafter, Depuy conducted the medical examination of Epright, and, the following day, Kevin Brignole

[2] Like the Appellate Court, we are compelled to point out that the disclosure indicated that Depuy had reviewed Epright's medical records and deposition testimony, had performed an independent medical evaluation on her and would now opine that the injuries to her neck and shoulder were the result of the motor vehicle accident. See *Epright* v. *Liberty Mutual Ins. Co.*, 212 Conn. App. 637, 655 n.15, 276 A.3d 1022 (2022). Notwithstanding the firm's good faith belief that these things were going to occur based on its deposition of Depuy, none of these things had taken place when the firm sent the notice to Liberty Mutual. Had the firm stated the actual basis for its disclosure, it would have expressed its intention to have Depuy review the deposition transcripts and perform a medical evaluation, rather than indicating that a deposition review and medical examination had already been conducted.

sent Liberty Mutual a copy of the medical examination report prepared by Depuy. In the report, Depuy opined that Epright's shoulder injury was causally related to the accident.

Upon receiving the report, Liberty Mutual filed a motion for order to show cause, requesting that the trial court issue a summons and order to Depuy, requiring him to appear before the court to demonstrate why Liberty Mutual's attached prayer for injunction and disgorgement should not be granted. In its prayer for injunction and disgorgement, Liberty Mutual sought to enjoin Depuy from testifying in the underlying action, to prohibit any use of Depuy's medical examination report at trial, and to require Depuy to disgorge all sums of money Liberty Mutual had paid him for his expert services in the underlying action.

The trial court, construing the motion as a "motion to preclude/motion to disqualify" Depuy, ordered a hearing on the motion and allowed Liberty Mutual to subpoena Depuy to appear at the hearing. Prior to the hearing, the firm, on behalf of Epright, filed an objection to Liberty Mutual's motion to preclude Depuy from testifying. The firm argued that neither Connecticut case law nor the rules of practice limit or prohibit a plaintiff from contacting and thereafter disclosing the defendant's disclosed expert witness as the plaintiff's own expert.

In a memorandum of decision, dated June 18, 2019, the trial court granted Liberty Mutual's motion to disqualify Depuy. As its basis for disqualifying Depuy, the court concluded that the firm's conduct in engaging in ex parte communications with Depuy "constitutes a clear violation of Practice Book § 13-4." The court reasoned that § 13-4, which governs the discovery procedures concerning expert witnesses, does not explicitly allow ex parte contact with an opposing party's expert

witness. Consequently, the court concluded that the rules of practice "do not authorize [counsel to make], and thus implicitly forbid counsel from making, ex parte contact with the opposing party's disclosed expert." The court, therefore, granted Liberty Mutual's motion to disqualify Depuy.[3] The court also noted that it would entertain any motions for sanctions and for the recovery of fees and costs by Liberty Mutual related to the firm's conduct.

In response to the trial court's exhortation, Liberty Mutual filed a motion for expenses, requesting that the court order the firm to reimburse Liberty Mutual for all fees, costs, and expenses related to Depuy. Attached to the motion was an affidavit setting forth the value of the legal services that Liberty Mutual's counsel had rendered in connection with this dispute as to Depuy ($16,732.50), and the amount Liberty Mutual had paid for Depuy's expert services up until that point ($12,895).

The trial court issued its ruling on the motion for expenses, drawing significantly from its earlier, June 18, 2019 memorandum of decision ordering Depuy's disqualification. The court stated that, although there was "no Connecticut authority directly dealing with this issue . . . [Connecticut has], like every other jurisdiction, clear and explicit rules regarding the obtaining of information from the other side's expert: they are known as rules of discovery. Every lawyer knows (or should know) what the rules are regarding the obtaining of information from an opponent's expert." (Citations omitted; footnote omitted.) The court noted that Prac-

---

[3] In addition to the writ of error, Epright filed an interlocutory appeal, challenging the trial court's order disqualifying Depuy from testifying at trial. The Appellate Court dismissed that appeal for lack of subject matter jurisdiction because the challenged interlocutory order was not a final judgment for purposes of appeal. See *Epright* v. *Liberty Mutual Ins. Co.*, 211 Conn. App. 26, 26, 271 A.3d 731 (2022). The order disqualifying Depuy is not at issue in this appeal.

tice Book § 13-4 (h) provides in relevant part that "[a] judicial authority may, after a hearing, impose sanctions on a party for failure to comply with the requirements of [§ 13-4]. . . ." The trial court then concluded that the requirements for sanctions for the violation of a discovery order or rule under the three part test established by this court in *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 17–18, 776 A.2d 1115 (2001) (*Millbrook*), were satisfied. Specifically, the trial court concluded that § 13-4 is "clear," it "was violated," and "[t]he sanctions of preclusion of expert testimony and related attorney's fees are proportional to the noncompliance at issue." The trial court reasoned that the firm's "actions have disrupted the docket and cost [Liberty Mutual] great expense and delay as a result of the loss of [its] disclosed expert. [Liberty Mutual] has had to find a new expert, impart all of the information previously given to its original expert, pay the new expert, and await his opinion. This disruption has delayed the trial for [more than one] year, which was imminent, and [has] impaired the court in the management of its docket." Due to the purported violation of § 13-4, the court ordered the firm to pay Liberty Mutual $12,895 in compensation for the expenses Liberty Mutual had paid to Depuy for his expert services. The trial court did not, however, order the firm to pay Liberty Mutual's attorney's fees associated with this dispute.

The firm filed a writ of error with this court, challenging the trial court's imposition of sanctions, which we transferred to the Appellate Court. The firm argued, inter alia, that the trial court had abused or improperly exercised its discretion in ordering sanctions. The Appellate Court agreed and reversed the order granting sanctions, concluding that Practice Book § 13-4 does not clearly prohibit ex parte communications between an attorney and an opposing party's disclosed expert witness. See *Epright* v. *Liberty Mutual Ins. Co.*, 212 Conn.

App. 637, 639–40, 662, 276 A.3d 1022 (2022). This appeal followed.[4]

Before this court, Liberty Mutual argues that "[t]he trial court's reimbursement order was a proper exercise of the court's power to sanction conduct that violates the rules of practice," particularly Practice Book § 13-4. Liberty Mutual further maintains that the trial court properly exercised its power to sanction conduct that disrupts its docket.[5] Finally, Liberty Mutual contends that, if it is not clear from the existing rules that ex parte communication with an opposing party's disclosed expert witness is sanctionable conduct, this court should exercise its supervisory authority to create a prospective rule clarifying that such conduct is prohibited.

The following legal principles and standard of review are applicable here. A trial court's power to sanction derives from two sources: its inherent powers to sanction certain conduct and the rules of practice, which authorize the imposition of sanctions for violations of specific rules. See, e.g., *Lafferty* v. *Jones*, 336 Conn. 332, 373, 246 A.3d 429 (2020), cert. denied,      U.S.      ,

---

[4] This court granted certification, limited to the following issue: "Did the Appellate Court correctly conclude that the trial court had improperly ordered sanctions against the [firm] on the basis of its alleged ex parte communications with an expert witness disclosed by [Liberty Mutual]?" *Epright* v. *Liberty Mutual Ins. Co.*, 345 Conn. 908, 908–909, 283 A.3d 505 (2022).

[5] Liberty Mutual contends that, even if the firm did not violate Practice Book § 13-4, the order of the trial court was proper because the court also relied on its inherent authority to impose sanctions against an attorney for conduct that disrupts its docket. After careful review of the trial court's order, in which the sanction was directly related to the cost expended by Liberty Mutual for Depuy's services, we cannot find on this record a basis for the court's invocation of its inherent authority in imposing the sanction related to the disruption of the proceedings, separate and apart from the firm's impermissible ex parte communication. We note, however, that our decision in no way serves to prohibit a trial court, in the appropriate circumstances, from exercising its inherent authority to sanction dilatory conduct that disrupts the docket.

141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021). Our review of a sanction order is governed by the standard set forth by this court in *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 17–18. See, e.g., *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 234–36, 963 A.2d 943 (2009) (applying *Millbrook* test to violation of Practice Book § 13-4). "First, the order [or rule] to be complied with must be reasonably clear. . . . This requirement poses a legal question that we will review de novo." *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 17. "Second, the record must establish that the order [or rule] was in fact violated. This require-ment poses a question of fact that we will review using a clearly erroneous standard of review." Id., 17–18. "Third, the sanction imposed must be proportional to the violation. This requirement poses a question of the discretion of the trial court that we will review for abuse of that discretion." Id., 18.

Our first inquiry, and the dispositive one in this case, is the legal question of whether Practice Book § 13-4 is "reasonably clear" in notifying attorneys that they may not engage in ex parte communications with another party's disclosed expert witness. Section 13-4 sets forth the requirements for a party's disclosure of expert wit-nesses who are expected to testify at trial. In connection therewith, the rule sets forth procedures to be utilized for obtaining information from an opposing party's expert by way of deposition. Neither Liberty Mutual nor the trial court has identified a particular provision in § 13-4 that explicitly prohibits ex parte communication with an opposing party's disclosed expert witness.

Our review of the language of Practice Book § 13-4 similarly reveals that the text itself does not contain an explicit prohibition on ex parte communications with an expert witness disclosed by an opposing party. Indeed, as the Appellate Court indicated, when "the judges of the Superior Court intended to limit a lawyer's

ex parte communications, they have explicitly said so. See Rules of Professional Conduct 3.5 ('[a] lawyer shall not: (1) [s]eek to influence a judge, juror, prospective juror or other official by means prohibited by law; [or] (2) [*c*]*ommunicate ex parte* with such a person during the proceeding unless authorized to do so by law or court order' . . .); Rules of Professional Conduct 4.2 ('[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so')." (Emphasis in original.) *Epright* v. *Liberty Mutual Ins. Co.*, supra, 212 Conn. App. 650. We find the absence of such a prohibition in § 13-4 significant.

Nevertheless, because a sanctions order may stand even if the rule was not explicit but still was reasonably clear, we must consider whether Practice Book § 13-4 is otherwise reasonably clear in its prohibition against ex parte communications. Liberty Mutual contends that the rule is comprehensive and provides the sole means through which a party may obtain information from another party's disclosed expert witness. We disagree. A review of the history of § 13-4 is illuminating.

In 2008, the judges of the Superior Court amended Practice Book § 13-4, which amendment became effective in 2009. Prior to that time, the rule had provided in relevant part: "Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of Section 13-2 and acquired or developed in anticipation of litigation or for trial, may be obtained *only as follows* . . . [through interrogatories to an opposing or other party or formally noticed depositions] . . . ." (Emphasis added.) Practice Book (2008) § 13-4.[6] The rule expressly limited the procedure for commu-

---

[6] Specifically, Practice Book (2008) § 13-4 provides in relevant part: "Discovery of facts known and opinions held by experts . . . may be obtained only as follows:

nication with an opposing party's expert to interrogatories to an opposing party and/or formally noticed depositions of the expert.

In 2009, the rule was amended, and the language that limited the methods of communication with an opposing party's expert was removed. See Practice Book (2009) § 13-4. The current version of the rule provides in relevant part that "the party disclosing an expert witness shall, upon the request of an opposing party, produce to all other parties all materials obtained, created and/or relied upon by the expert in connection with his or her opinions in the case"; Practice Book § 13-4 (b) (3); and that "a party may take the deposition of any expert witness disclosed . . . ." Practice Book § 13-4 (c) (1). As the rule did prior to the amendment, the current version of the rule expressly permits a party to obtain information by requesting it from the opposing party and/or by taking a deposition in accordance with the rules of discovery. Critically, though, the current rule does not include the language that existed in the rule before the 2009 amendments, which expressly confined communication with an opposing party's disclosed expert to interrogatories served on the opposing party or depositions.

Thus, before the 2009 amendment, Practice Book § 13-4 provided the *exclusive* means for communicating with an opposing party's expert witnesses, but the current version no longer includes that limitation. Therefore, although the version of the rule prior to 2009

"(1) (A) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (B) Unless otherwise ordered by the judicial authority upon motion, a party may take the deposition of any expert witness disclosed pursuant to subdivision (1) (A) of this rule in the manner prescribed in Section 13-26 et seq. governing deposition procedure generally. . . ."

clearly restricted communication to only two identified methods, we cannot conclude that the current rule clearly does.[7]

This conclusion is further supported by looking at Practice Book § 13-4 as a whole and, in particular, the comparison between how the rule deals with disclosed expert witnesses versus nontestifying experts. Indeed, § 13-4 (f), the current provision that describes how a party may discover the facts and opinions held by non-testifying experts, contains express limiting language regarding communication. Section 13-4 (f) provides: "A party may discover facts known or opinions held by an expert who had been retained or specially employed by another party in anticipation of litigation or preparation for trial *and who is not expected to be called as a witness at trial only* as provided in Section 13-11 or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." (Emphasis added.) The drafters of the rule clearly prohibited any communication outside of the two identified scenarios. It is reasonable to presume that, when the drafters included limiting language in one section of the rules of practice addressing communication with an expert but omitted it in another section addressing communication with an expert, they did so intentionally. See, e.g., *Stafford* v. *Roadway*, 312 Conn.

---

[7] We are aware that, prior to the 2009 amendment, the rule reflected a long-standing convention generally prohibiting ex parte communications with another party's disclosed expert witness, and we have no doubt that the trial court was correct that "[e]very lawyer knows (or should know) what the rules are regarding the obtaining of information from an opponent's expert." However, the prohibition is not expressed on the face of the current rule, and the deletion of the exclusivity language in 2009 prevents us from concluding that the prohibition clearly and unquestionably remained in force after the 2009 amendment. So, despite our distaste, we are compelled to agree with the Appellate Court's reversal of the trial court's imposition of sanctions.

184, 194, 93 A.3d 1058 (2014) ("[i]t is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly" (internal quotation marks omitted)); *State* v. *Heredia*, 310 Conn. 742, 761, 81 A.3d 1163 (2013) ("[w]hen a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed" (internal quotation marks omitted)). See generally, e.g., *Brown* v. *Commissioner of Correction*, 345 Conn. 1, 9, 282 A.3d 959 (2022) (interpretive construction of rules of practice is governed by same principles as those governing statutory construction).

The difference in treatment between disclosed expert witnesses and nontestifying experts in Practice Book § 13-4 is reasonable based on their different roles in the litigation process. The role of a disclosed expert witness is distinct from that of a nontestifying expert consultant because nontestifying experts often consult with attorneys concerning trial strategy. As a result, discovery of nontestifying experts' opinions is limited because their knowledge and opinions are integrally intertwined with an attorney's work product. See, e.g., *QBE Ins. Corp.* v. *Interstate Fire & Safety Equipment Co.*, Docket No. 3:07cv1883 (SRU), 2011 WL 692982, *5 (D. Conn. February 18, 2011); see also, e.g., *Long-Term Capital Holdings*, *L.P.* v. *United States*, Docket No. 01-CV-1290 (JBA), 2003 WL 21269586, *2 (D. Conn. May 6, 2003) (explaining that limitation on discovery related to nontestifying experts serves to advance "the interest in allowing counsel to obtain the expert advice they need in order properly to evaluate and present their clients' positions without fear that every consultation with an expert may yield grist for the adversary's mill" (internal quotation marks omitted)).

Communication with a disclosed expert is treated differently for good reason. Permitting a party to take a deposition of an opposing party's disclosed expert and to review the materials obtained, created, and relied on by that expert in arriving at his or her opinion is necessary because the disclosed expert will testify at trial and be subject to cross-examination. If this were not so, parties would be unduly hampered in their trial preparation and ability to effectively cross-examine the expert. We acknowledge that the rule does provide a way to take a deposition to satisfy those concerns, but it does not follow therefrom, as Liberty Mutual suggests, that the rule clearly prohibits all communication outside of a deposition. This is especially so given that this very rule previously had language that explicitly confined communication in that way, but that confining language was subsequently eliminated. At the very least, the amendment to the rule renders the rule in its current form insufficiently clear on the question of whether ex parte communication with an opposing party's disclosed expert is prohibited.

For the foregoing reasons, we conclude that Practice Book § 13-4 does not clearly prohibit ex parte communications with another party's disclosed expert. The limiting language concerning discovery related to disclosed expert witnesses has been removed and is not part of the current rule. Consequently, a reasonable attorney reading § 13-4 and its historical development may reasonably understand this omission as it relates to disclosed experts to be intentional. Still, we pause here to make it clear that we do not express any approval of the firm's conduct in this case, and we do not opine on whether ex parte communication with an opposing party's expert should or should not be permissible. We hold only that § 13-4 is not reasonably clear in notifying attorneys that they may not engage in ex parte communications with an opposing party's disclosed expert wit-

ness and, therefore, cannot properly serve as the basis for a sanctions finding.[8]

Finally, we address Liberty Mutual's contention that we should exercise our supervisory powers to clarify that ex parte contact with an opposing party's disclosed expert witness is impermissible. "The exercise of our supervisory powers is an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, [although] not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *State* v. *Lockhart*, 298 Conn. 537, 576, 4 A.3d 1176 (2010).[9]

We are not persuaded that the conduct at issue here so implicates the fundamental fairness and integrity of the judicial system as a whole that we should engage in the extraordinary remedy of exercising our supervisory authority. Indeed, Liberty Mutual admits that other jurisdictions permit such ex parte contact. Although Liberty Mutual excoriates the firm's conduct as creating "misdirection and confusion" and as "interfer[ing] with the fact-finding process," such conduct is not without a solution under our present law. Although we understand the trial court's indignation and frustration related to the disruption of the proceedings, we cannot conclude that the firm's conduct in this case so interfered with the fundamental fairness and integrity of the judicial system that it requires the exercise of our supervisory powers.

---

[8] We caution parties not to engage in an expansive reading of our holding when dealing with an opposing party's disclosed expert witness.

[9] We encourage the Rules Committee of the Superior Court to evaluate the propriety of ex parte communications with an opposing party's disclosed expert witness and to determine whether an amendment to the current rule is warranted.

Accordingly, we agree with the Appellate Court that the trial court improperly imposed sanctions on the firm for conducting ex parte communications with an expert witness previously disclosed by Liberty Mutual.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.