MULLINS, J.
**318 *1195 The plaintiff, Sun Val, LLC, appeals[1] from the judgment of the trial court rendered in its favor against the defendant, the Commissioner of Transportation. On appeal, the plaintiff contends that the trial court improperly (1) applied the wrong environmental regulations to determine whether materials left on the plaintiff's property were contaminated and, as a result, failed to award appropriate damages for removal of those contaminated materials, (2) determined that the **319 plaintiff failed to mitigate its damages, and (3) rejected the plaintiff's claim for lost profits. We disagree and, accordingly, affirm the judgment of the trial court.
The record reveals the following facts, as found by the trial court, and procedural history relevant to our resolution of this appeal. The plaintiff was formed in August, 2002, for the limited purpose of purchasing and managing a parcel of real property (property) located in the town of New Milford. The property, consisting of slightly less than eleven and one-half acres, had been used for a variety of purposes over the years, including as a farm, a gravel quarry, and an all-terrain vehicle course. In September, 2002, the plaintiff purchased the property with the intent to regrade it and resell it for possible development.
In the summer of 2006, Hallberg Contracting Corporation (Hallberg) was hired as a subcontractor for a highway reconstruction project undertaken by the defendant. Shortly thereafter, and with the defendant's consent, Hallberg entered into an oral contract with Dominick Peburn, an individual that Hallberg believed had authority to act on behalf of the plaintiff, to use the property for "crushing and stockpiling" construction materials related to the project. Without verifying Peburn's authority, Hallberg proceeded to haul approximately thirty-two truckloads of "mostly soil and clay-like material, including only a minimal amount of milled asphalt and concrete," and deposited it in an area occupying one-quarter acre in the northwest corner of the property.[2] In September, 2006, the plaintiff's real estate agent visited the property and informed the plaintiff's members that material was being deposited on the **320 property. Thereafter, Peter Joseph and Jeffrey Serkes visited the property on behalf of the plaintiff *1196 to examine the materials deposited by Hallberg.
While pursuing its legal remedies for the unauthorized dumping on its property, in December, 2006, the plaintiff entered into a contract to sell the property to BTP New Milford, LLC (Bow Tie) for $2,025,000. The contract of sale included contingency provisions relating to, inter alia, clear title, compliance with applicable laws, regulations, and ordinances, and the payment of taxes. Under the contract, Bow Tie was obligated to perform standard due diligence on the property, including engineering studies, a market analysis, a Phase I environmental assessment, and to investigate the applicable zoning regulations. Phase I environmental assessments are limited, and include the following three components: (1) identify areas of concern or previously recognized environmental conditions; (2) review historical record research back to 1940 or the earliest known development; and (3) conduct visual site visits and interviews. A Phase I environmental assessment does not involve sampling or testing of soil or material on the property.
The contract also contained additional contingencies as a result of the recent dumping on the property. Specifically, the plaintiff agreed to hire an environmental consultant to perform both a Phase I and Phase II environmental assessment of the property. A Phase II environmental assessment is field oriented and involves taking test samples from areas of concern previously identified in the Phase I environmental assessment. Samples may be taken by digging, drilling, or boring.
The contract provided that, in the event that the test results revealed evidence of contamination on the property, Bow Tie would have the option of terminating the contract if the cost to remediate the soil was greater **321 than $150,000. The contract, however, did not specify whether the assessments would be limited to only areas of new dumping. The plaintiff hired an engineering and environmental consulting firm to perform the Phase I and Phase II environmental assessments. Prior to this time, the plaintiff had not requested or seen the results of any Phase II environmental assessment on the property and, therefore, had not reviewed results of soil sampling on the property. The results of the Phase I environmental assessment were issued on January 31, 2007, and the results of the Phase II environmental assessment were issued on February 20, 2007. After receipt of these assessments, the contract for the sale of the property to Bow Tie terminated.
As early as November, 2006, Hallberg offered to remove thirty truckloads of material from the plaintiff's property. Then, in January, 2007, Hallberg again presented the plaintiff with a written offer to restore the property to its original condition.[3] Hallberg offered, inter alia, to remove approximately thirty truckloads of material, the amount that Hallberg admitted to depositing on the property. In return, Hallberg demanded a release from all liability of itself, its agents, and its employees associated with dumping the materials on the plaintiff's property. The plaintiff rejected Hallberg's offer.
*1197 Subsequently, the plaintiff commenced the present action,[4] alleging, inter alia, that the defendant **322 negligently authorized Hallberg to deposit construction materials on the property. The plaintiff sought damages in the amount of $483,864 for remediation of the property and $1,146,500 for lost profits. In response, the defendant pleaded, inter alia, failure to mitigate damages as a special defense. The case was tried before the court.
At trial, both parties presented numerous exhibits, and the court heard testimony from multiple witnesses pertaining to the amount, quality, and location of material deposited by Hallberg. Indeed, each party introduced testimony from environmental professionals[5] who testified about the appropriate manner in which to remove the dumped material from the plaintiff's property.
The plaintiff introduced testimony from Brian Conte, a licensed environmental consultant who primarily performs field work as part of environmental due diligence for real estate transactions. Conte submitted a plan for removing the Hallberg material from the property, which suggested that 60 percent of the material be sent to a high level, more expensive, facility; 30 percent of the material be sent to a low level, less expensive, facility; and 10 percent of the material be sent to a recycling facility. Under this plan, the cost of removing thirty-two truckloads would be $105,122.[6] Conte also produced a report in which he opined that the material on the property was "lightly polluted" and that it "would **323 not qualify as clean fill under [applicable] solid waste regulations."
The defendant introduced testimony from Douglas Martin, a licensed environmental professional with more than thirty years of professional environmental experience and expertise in the area of environmental site assessments. Martin testified and submitted a plan for removing the Hallberg material from the property. In his plan, he opined that 90 percent of the material should be sent to a low level, less expensive, facility, and that 10 percent of the material should be sent to a recycling facility at a cost of $60,492. In support of this plan, Martin produced a report stating that "much of the subject material appears to be consistent with the definition of [clean fill] under the [solid waste] regulations ...."
In addition to testimony from these experts regarding the quality of the material deposited by Hallberg, photographs of the property were presented, which also provided insight into the quality of material attributable to Hallberg. These photographs, which were taken by Hallberg's risk manager, Brian Festa, revealed that the northwest corner of the property contained regularly sized piles of earth and clay, which were not present throughout the rest of the property. Alan Antonelli, a Hallberg employee, provided testimony that Hallberg only deposited soil and clay-like material on the property.
*1198 After considering all of the testimonial and documentary evidence presented at trial, the trial court found that the Hallberg material must be removed, but did not adopt either Conte's or Martin's proposed plan in full. Instead, the court explained that Conte's plan was partly based on flawed assumptions and extrapolations and that Martin's plan was "too conservative." The court also credited the photographs showing the material **324 dumped on the northwest corner of the property to largely consist of soil or clay and Antonelli's corroborating testimony, thus suggesting that a larger portion of the material could be sent to the low level facility.
The trial court agreed with both experts that thirty-two truckloads would comprise 640 tons. The trial court then compared the costs for disposal in each of the expert's reports. The trial court found that Conte's costs for disposal were lower because the report was five years older than the report from Martin. Therefore, the trial court used the higher figures from Martin's report. Because Martin did not opine that any materials should go to the high level facility, he did not include a cost for removal to that facility. To arrive at a disposal cost for the high level facility, the trial court added 10 percent to the cost used by Conte for the high level facility. Accordingly, the court calculated the disposal costs using a cost of $29 per ton for the recycling facility, $65 per ton for the low level facility, and $144.65 per ton for the high level facility. Using these rates, the court further found that "70 percent of the material, 448 tons, could legally be disposed of at a low level [facility] for a cost of $29,120 ... 20 percent of the material, 128 tons, needs to be legally ... disposed of at a higher level [facility] at a cost of $18,515.20 ... and 10 percent, 64 tons, could be recycled for a cost of $1856 .... The court also agrees with [Martin] as to ancillary costs, such as survey at $1625, clearing and grubbing at $2715, erosion control measures at $801.80, excavation and direct load out at $3949.24, and engineering and consulting fees at $11,140. Therefore, the court concludes that the plaintiff has proven that the defendant caused the plaintiff to sustain $69,722.24 in remediation costs."
At the conclusion of trial, the court made the following factual findings: (1) "the plaintiff has proven the defendant negligent in its authorization of Hallberg to **325 use the property for the disposal of materials from the project"; (2) "the amount of damages proven by the plaintiff is $69,722.24"; and (3) "the defendant has proven that the plaintiff failed to mitigate its damages in the amount of $34,598.41 and that, as a result, the $69,722.24 should be reduced by $34,598.41." The trial court then reduced the amount remaining by an additional 15 percent on the basis of the plaintiff's comparative negligence and, accordingly, awarded $29,855.26 in damages. This appeal followed. Additional relevant facts will be set forth as necessary.
I
A
The plaintiff first claims that the trial court improperly applied regulatory provisions governing remediation; see Regs., Conn. State Agencies § 22a-133k-1 et seq. (remediation regulations); instead of regulatory provisions governing the disposal of solid waste; see Regs., Conn. State Agencies § 22a-209-1 et seq. (solid waste regulations); in determining the plaintiff's damages. The plaintiff further claims that the trial court failed to award sufficient damages as a result of the failure to apply the solid waste regulations. The defendant responds by asserting that the trial court applied the proper regulations. Specifically, the defendant claims that the trial court *1199 relied on the report and opinion of Conte, who utilized the solid waste regulations. We agree with the defendant.
"The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find **326 support in the facts that appear in the record." (Internal quotation marks omitted.) Stratford v. Jacobelli , 317 Conn. 863, 869, 120 A.3d 500 (2015).
On appeal, the plaintiff claims that the trial court applied the wrong regulations and then posits that this claim presents an issue of law over which we exercise plenary review. For the reasons which follow, we disagree that the plaintiff's claim regarding the trial court's award of damages presents a question of law.
A review of the trial court's memorandum of decision reveals no indication that the court relied on the remediation regulations as opposed to the solid waste regulations. Instead, the record reveals that both parties' experts indicated at some point during their testimonies that the remediation regulations did not apply to removal of the Hallberg material from the property. Specifically, Conte, the plaintiff's expert, testified that the remediation regulations are "a good reference, but [they have] no bearing" if there is no remediation taking place on the soil. He further testified that the remediation regulations "were actually set up as a means to determine when you're essentially done with your remediation.... [T]here's not remediation here, but it's the only standards we have in the state to compare to." Likewise, the defendant's expert, Martin, when asked on direct examination if the remediation regulations applied to the property, responded "[n]ot as far as I'm aware." He further opined that "[r]emediation, typically, you need [a] better definition of what it is you're removing and ... the basis for the limits of what you're removing. And, typically, you know, in Connecticut, if you're performing a remediation, then you would ... perform sampling and postremediation sampling, post-excavation sampling in this case, with the idea that you're trying to meet some regulatory end point."
Consistent with the testimony of the experts, the trial court's ninety page memorandum of decision is devoid **327 of any findings regarding specific contamination levels or application of the remediation regulations. Rather, the memorandum of decision reveals that the trial court made a factual determination as to the percentages of the waste that could be allotted to the different disposal facilities on the basis of qualitative information provided by the parties' experts. This analysis by the trial court is consistent with the definitions supplied in the solid waste regulations. Furthermore, during closing arguments, the trial court pointed out that removal is not the only option for polluted soil "under [the] definition of 'clean fill' [in the solid waste regulations]." The court made no reference to the remediation regulations. We conclude that the trial court, after weighing the credibility of each expert and on the basis of the information they provided, made a factual determination regarding the appropriate plan for removal. Accordingly, we reject the plaintiff's claim that the issue before us is one of law. Instead, we understand the plaintiff's claim to be that the findings of the trial court regarding the percentages of the waste that could be allotted to the different disposal facilities and the costs associated *1200 with these removal methods were clearly erroneous.
We now turn to that question. In doing so, we apply the clearly erroneous standard of review. "Although we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses ... we will not uphold a factual determination if we are left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) Wyszomierski v. Siracusa , 290 Conn. 225, 237-38, 963 A.2d 943 (2009).
Throughout the course of the trial, the court heard significant testimony regarding the amount and nature of the material dumped on the plaintiff's property by Hallberg and the appropriate manner in which to remove that **328 material. To begin with, the trial court heard testimony from a Hallberg employee, Antonelli, who described the material brought to the property by Hallberg as "fill material," essentially "a fill of dirt material" with "maybe a little clay in it." This description of the Hallberg material was consistent with photographs that were presented to the court, which ultimately described the deposits on the northwest corner of the property as "regularly-sized piles containing earth and clay-like material ...." Antonelli also testified that discarded material, such as asphalt, bricks, catch basins, and drainage pipes, depicted in additional photographs of the remainder of the property, were not brought there by Hallberg. Antonelli explained that, at the time of the dumping on the property, the highway reconstruction project was not in a phase where materials such as bricks, catch basins, and drainage pipes would have been removed from the project site.
Next, Conte testified over the course of three days regarding his suggested plan for removal of the Hallberg material. Specifically, he described how he relied on data contained in the two environmental assessments that he had performed for the plaintiff in 2006 in connection with the pending sale of the property to Bow Tie. Conte explained that the assessments, which involved taking samples from various soil piles, "indicated [that] petroleum and semi volatile organics were present in [the] soil piles throughout the site," the source of which was "likely coal ash or bituminous asphalt," and that it was his professional opinion that it was from site wide fill material. He further testified that his proposed removal plan was "based on whether or not the soil [was] polluted ... and whether or not the soil piles were present there ... [b]etween 2005 and 2006" using comparisons of aerial photographs of the property. Notably, however, Conte also testified that he determined the amount of material that he allotted for **329 removal to each facility based on "[v]isual observations and estimation[s]."
Martin opined on the soundness of the removal plan proposed by Conte, stating that he didn't believe there was "a direct correlation between the [plaintiff's proposed removal] and the [environmental] conditions on the property." In support of this statement, he pointed to a lack of "quality data relating to either [removal] scenario" presented by Conte. Martin further testified that "there [were] assumptions made by [Conte] as to the quality [of the material], but there was no basis for [those assumptions]." Specifically, Martin identified the quantity of debris in the material and the level of contamination as assumptions Conte made without a basis of support. Martin asserted that, as a result, the material "was not characterized" for removal on the basis of any "real data ...." He further testified that the failure to properly characterize the material impacted *1201 the assumptions made that ultimately drove disposal costs. Martin's written report also concluded that "much of the subject material ... if disposed, could conceivably be shipped to any number of closer, less-expensive facilities [than those Conte had proposed in his plan].
Martin then testified about how he relied on the information gathered by Conte, as well as his own visual inspection of the perimeter of the property, to create his removal plan. He stated that it was a "fairly conservative" estimate on the basis that he did not have access to site specific information. During cross-examination, however, Martin conceded that, because he had never been on the property or performed any independent testing of his own, he could not contradict Conte's findings regarding the contamination of the material.
The trial court's memorandum of decision reveals that the credibility of the witnesses, in particular the experts, was a significant consideration in its **330 determination. "[I]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.... On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) Bristol v. Tilcon Minerals, Inc. , 284 Conn. 55, 65, 931 A.2d 237 (2007).
Furthermore, "[i]t is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony.... The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other.... The trier [of fact] may not, however, arbitrarily disregard, disbelieve or reject an expert's testimony in the first instance.... There are times ... that the [fact finder], despite his superior vantage point, has erred in his assessment of the testimony.... Where the trial court rejects the testimony of a plaintiff's expert, there must be some basis in the record to support the conclusion that the evidence of the [expert witness] is unworthy of belief.... [W]here the factual basis of an opinion is challenged the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value." (Citations omitted; internal quotation marks omitted.) Wyszomierski v. Siracusa , supra, 290 Conn. at 243-44, 963 A.2d 943.
The trial court noted that Conte's opinions "were only as good as the facts on which they were based, and many of these facts do not square with the facts found by the court." The trial court found fault with many of the assumptions made by Conte that were used as a basis for the plaintiff's removal plan and cost estimates, including the following: the samples analyzed for the Phase II environmental assessment were taken from the entire property, not just from the small corner **331 where the trial court found that Hallberg had limited its deposits; the samples came from areas that had recently been levelled by a tractor, making it impossible to know what soil was attributable to Hallberg; Conte assumed that any contaminants in his samples came from the Hallberg material despite the mixing of the Hallberg material with native soil and despite knowing that likely there were contaminants on the property attributable to sources other than Hallberg, given the history and lack of soil testing. Furthermore, the trial court heard evidence that Conte's findings were qualified in the report as "preliminary in nature, and [that they] should not be considered a full delineation of the nature, [or] extent of contamination at the [property]." Ultimately, the trial *1202 court considered "the [plaintiff's] evidence in regard to the quality and volume of material brought by Hallberg ... circumstantial or speculative" because "there were no eyewitnesses to Hallberg's dumping."
As it noted in its memorandum of decision, however, the trial court "found Hallberg's employees to be credible in regard to the amounts of material brought to the property, where that material was placed on the property, and the dates on which material was brought there." In particular, Antonelli's description of the Hallberg material as "a fill of dirt" with "maybe a little clay" was consistent with the photographs of the northwest corner of the property. Furthermore, material of this nature would be largely disposable at a low level facility.[7]
**332 Significantly, the trial court concluded in its memorandum of decision "that the plaintiff has seriously damaged its own credibility on the issue of damages by means of inconsistent allegations and claims that the plaintiff has made against other entities ...." Indeed, the court noted that the plaintiff "has attempted, unfairly, to shape the presentation of the facts, and the facts themselves to fit the targets in each individual case.[8] ... These strategies by [the plaintiff], in the court's eyes, create a huge credibility gap, especially in regard to the proof of damages in this case." (Footnote added.) After a careful review of the record, we conclude that the trial court's factual findings regarding the percentages of the waste that could be allotted to the different disposal facilities, and the costs associated with these removal methods, are supported by evidence in the record and are, therefore, not clearly erroneous.
B
The plaintiff also appears to make a related claim that the trial court improperly failed to adopt Conte's proposed removal plan and, as a result, awarded insufficient damages. The defendant responds by repeating its claim that the award was sufficient because the trial court's measure of damages for removal and disposal of the material was consistent with the solid waste regulations.
We set forth the appropriate standard of review. We recognize that "[t]he trial court has broad discretion in determining damages.... The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) Gianetti v. Norwalk Hospital , 304 Conn. 754, 780, 43 A.3d 567 (2012).
**333 The plaintiff asserts that the trial court's award of damages is insufficient as a result of its determination that a higher percentage of the Hallberg material could go to a lower level, less expensive facility than what was proposed in Conte's removal plan. Notably, the plaintiff is not claiming on appeal any error with the actual costs associated with each facility that *1203 were used to calculate the award of damages. Rather, the plaintiff's claim rests on the assertion that a higher percentage of the material should go to a high level, more expensive facility, thus entitling the plaintiff to a larger award for damages. Because we already have concluded that the trial court's finding regarding the percentage of material that could go to each facility was supported by the evidence contained within the record, we also conclude that the trial court was not obligated to accept Conte's proposed removal plan, and its award of damages is, therefore, not clearly erroneous.
II
The plaintiff next claims that the trial court improperly concluded that the plaintiff failed to mitigate its damages by refusing to accept Hallberg's offer to remove material from the property. Specifically, the plaintiff asserts that the trial court improperly determined that the plaintiff had failed to mitigate its damages because (1) it was unreasonable for the trial court to expect it to allow Hallberg back onto the property that it had damaged, (2) the plaintiff had a good faith belief that Hallberg was responsible for depositing all of the discarded material that existed on the property, and (3) accepting Hallberg's offer would have precluded the plaintiff from exercising its substantive right to bring an action against those responsible for additional damages.
The defendant responds by asserting that acceptance of Hallberg's offer, along with the drafting of a narrow **334 release, would not infringe upon the plaintiff's right to bring an action against either Hallberg or the defendant for additional damages. The defendant further contends that the plaintiff could not have refused the offer on the basis of its belief that Hallberg was responsible for all of the material discarded on the property because the evidence at trial revealed that the plaintiff was aware of other dumping by third parties, both before and after Hallberg brought its materials to the property. We agree with the defendant.
We begin by setting forth the standard of review and the principles of law governing the plaintiff's claim. "We have often said in the contracts and torts contexts that the party receiving a damage award has a duty to make reasonable efforts to mitigate damages.... What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier." (Internal quotation marks omitted.) Murtha v. Hartford , 303 Conn. 1, 17 n.5, 35 A.3d 177 (2011). "Questions of fact are subject to the clearly erroneous standard of review." (Internal quotation marks omitted.) Id., at 12, 35 A.3d 177.
"[T]he burden of proving that the injured party could have avoided some or all of his or her damages universally rests on the party accused of the tortious act." (Internal quotation marks omitted.) Preston v. Keith , 217 Conn. 12, 21, 584 A.2d 439 (1991). "To claim successfully that the plaintiff failed to mitigate damages, the defendant must show that the injured party failed to take reasonable action to lessen the damages; that the damages were in fact enhanced by such failure; and that the damages which could have been avoided can be measured with reasonable certainty." (Internal quotation marks omitted.) Id., at 22, 584 A.2d 439. Furthermore, "[t]he duty to mitigate damages does not require a party to sacrifice a substantial right of his own in order to minimize a loss." Camp v. Cohn , 151 Conn. 623, 627, 201 A.2d 187 (1964).
**335 The following additional facts are relevant to this claim. At trial, the *1204 defendant introduced evidence that, in January, 2007, Hallberg made a written offer to remove approximately thirty truckloads of material from the property in exchange for a written release from liability of Hallberg, its agents, and its employees. In its memorandum of decision, the trial court found that "the plaintiff could have eliminated virtually all of the damages arising from Hallberg's dumping from the property if it had accepted this offer." The trial court further concluded that "Hallberg would have borne the expense and exposure of disposing properly of this material, whatever it was made of, and the plaintiff still could have reserved the right, by drafting the Hallberg release narrowly, to [bring an action against the defendant] for whatever consequential damages may have ensued by the later release or escape of contaminants." We agree with the trial court.
In fact, the trial court heard testimony from Conte supporting the position that the plaintiff could have mitigated its damages with regards to the thirty-two truckloads of material deposited by Hallberg.[9] Conte testified that some of the samples collected from the property showed "no clear change between what was native and what was fill," indicating that the Hallberg material continued to mix with soil "native" to the property. Thus, the court found that accepting the Hallberg **336 offer at the time it was presented would have "either completely prevented or at least substantially diminished" any potential for concomitant contamination.
The trial court also relied on evidence introduced by the parties regarding costs for removal. At trial, Conte supplied the court with cost estimates to transport and dispose of the material at each of the three disposal facilities. Martin provided cost estimates for disposal at the low level and recycling facilities only. As noted previously in this opinion, the trial court used the plaintiff's cost estimate when calculating the cost to dispose of the material at the high level facility, but added 10 percent to account for an increase in cost over time because the plaintiff's figures were from 2010, whereas the defendant's figures were from 2015. The trial court used the defendant's cost estimates, which were higher than the plaintiff's estimates, when calculating the disposal cost at the low level and recycling facilities because it recognized that those figures were more recent and, therefore, more accurately represented the costs at the time of trial. Using these figures, the court calculated the total expense to dispose of thirty-two truckloads of material under its plan allotting 70 percent to a low level facility, 20 percent to a high level facility, and 10 percent to recycling. In order to arrive at the amount of damages due to the plaintiff's failure to mitigate, the court divided thirty (truckloads) by thirty-two (truckloads), then multiplied that quotient with the total damages it had awarded to the plaintiff for removal, excavation, and load out. Under this approach, the trial court found "that the plaintiff failed to mitigate its damages in the amount of $50,100.41." This was *1205 then offset by $15,502, the amount the plaintiff received from settling a separate action against Hallberg, so that the total amount attributable to the failure to mitigate was $34,598.41.[10] **337 After a careful review of the record, we conclude that there was evidence to support the trial court's finding that the plaintiff failed to take reasonable action to lessen its damages, and that those damages were, in fact, enhanced by that failure; we further conclude that the damages that could have been avoided can be measured with reasonable certainty. Thus, we conclude that the trial court's finding that the plaintiff failed to mitigate its damages by refusing Hallberg's offer is supported by sufficient evidence in the record and is, therefore, not clearly erroneous.
III
The plaintiff finally claims that the trial court improperly rejected its claim for lost profits. Specifically, the plaintiff contends that the defendant's negligence was a proximate cause of the termination of the sale to Bow Tie, resulting in a loss of profits in the amount of $1,146,500. The defendant responds by arguing that it cannot be held responsible for profits lost as a result of the cancelation of the sale to Bow Tie because its negligence can be attributed only to a small portion of the material discarded on the property. We agree with the defendant.
We begin by setting forth the appropriate standard of review. "[T]he trial court has broad discretion in determining damages.... The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Citations omitted; internal quotation marks omitted.)
**338 BeverlyHills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin , 247 Conn. 48, 68, 717 A.2d 724 (1998). "In deciding whether damages properly have been awarded, however, we are guided by the well established principle that such damages must be proved with reasonable certainty.... Although we recognize that damages for lost profits may be difficult to prove with exactitude ... such damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty.... [T]he plaintiff cannot recover for the mere possibility of making a profit." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., at 69-70, 717 A.2d 724. "In order to recover lost profits, therefore, the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty." Id., at 70, 717 A.2d 724.
Further, "[t]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries.... The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection.... This causal connection must be based upon more *1206 than conjecture and surmise." (Internal quotation marks omitted.) Ugrin v. Cheshire , 307 Conn. 364, 374-75, 54 A.3d 532 (2012).
In support of its claim on appeal, the plaintiff relies on testimony from the plaintiff's real estate broker, Harold Kurfehs. Specifically, the plaintiff asserts that Kurfehs' testimony established that the Hallberg material was a proximate cause of the cancelation of the sale to Bow Tie. We disagree.
At trial, Kurfehs offered the following testimony on direct examination by the defendant's counsel:
"Q. But you mentioned there's a slew of things that people would consider so-
"A. There's no question of that.
**339 "Q.-environmental is one of them but ... there's other-
"A. The problem though is that there are many, many different things a person has to consider when they're buying a piece of land to build their building. You cannot tell sometimes which are the most important things in their mind, and they're not going to verbalize that sort of thing. But I know from experience that environmental is way up there.
"Q. But, as I was saying, it could be one of some significant factors-
"A. Oh, yeah.
"Q.-but it's not the only-
"A. No question.
"Q.-factor.
"A. Not the only factor but a very significant one."
The defendant responds to this argument by highlighting the following testimony from Kurfehs on direct examination:
"Q. Have you ever encountered properties where you thought [you] would sell but didn't sell?
"A. Oh, many times, many times.
"Q. Can you provide an example for the court?
"A. Being in the business for [twenty-nine] years, it's hard to even think.... [Y]ou probably have more deals that don't close than do. It's the nature of the business."
The record indicates that the trial court also heard the following testimony from Kurfehs on direct examination:
**340 "Q. Returning to the ... Bow Tie deal, do you know exactly why the deal fell through?
"A. As I said before, in a lot of cases, a buyer will just say I'm not going to go through with the deal, and they won't really tell you why they won't go through with the deal. Sometimes they give you an answer to satisfy you and say one thing and then really mean another thing. And I'm sure that environmental issue did loom a little high, but I couldn't say it was the only issue."
Despite the plaintiff's claim to the contrary, we cannot conclude that the foregoing testimony established that the Hallberg material was a proximate cause of the cancelation of the sale to Bow Tie. Specifically, a review of the record reveals that the plaintiff failed to meet its burden of demonstrating that the presence of the Hallberg material was the proximate cause of the plaintiff's lost profits and did not present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty. Instead, although the trial court heard extensive testimony about the effects of the environmental condition of the property on the sale of the property to Bow Tie, that testimony was wholly speculative. For instance, Kurfehs spoke about the effect that environmental conditions *1207 may have on purchasers in real estate transactions in general . He was not directing his testimony to the Bow Tie contract in particular. In addition, Kurfehs conceded that, with regard to the Bow Tie contract specifically, he could not say that the environmental issue was the only reason why the sale was not completed. Rather, he speculated as to Bow Tie's reasons for cancelling the contract on the basis of his experience with real estate transactions in general.[11] **341 In its memorandum of decision, the trial court found that the plaintiff had failed to prove that the defendant's actions caused the cancelation of the sale to Bow Tie. In support of its finding, the trial court explained that "Bow Tie had many contingencies in its proposal to purchase the property," some of which were unrelated to the Hallberg material. For example, Bow Tie was concerned about a pipe on the property, an easement possibly affecting clear title, and the environmental condition of the property as a whole. Further, testimony from Serkes, who represented a member of the plaintiff organization, indicated that there was no guarantee that the sale would close even if the plaintiff were to clean up the property.[12]
The trial court also recognized that "several deals to purchase all or part of the property at a profit to the plaintiff had been proposed before and after the Hallberg dumping, and none [has] ever come to fruition." Relying on photographs admitted at trial demonstrating that "the property had become an eyesore," the trial court reasoned that "the cosmetic appearance, or perhaps the difficulty in securing the property, may well have turned off a potential commercial purchaser ...." The trial court further emphasized that, because it found that Hallberg was responsible for depositing only thirty-two truckloads of material on a small corner of the property, "such minor dumping, especially in light of [the other dumping by third parties], which would have included all unwanted material on the property, was not an actual or a proximate cause of the Bow Tie deal going sour."
**342 We conclude that there was sufficient evidence in the record to support the trial court's finding that the plaintiff did not meet its burden of establishing that the defendant was the proximate cause of its lost profits.[13] Accordingly, we conclude *1208 that the trial court properly did not award the plaintiff damages for lost profits.
The judgment is affirmed.
In this opinion the other justices concurred.

The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

At trial, the plaintiff claimed that Hallberg dumped approximately 225 truckloads of material over the entire property; on the basis of the evidence presented, however, the trial court found that Hallberg deposited thirty-two truckloads and that it was deposited in a "small [one-quarter] acre" portion of the property. The plaintiff does not challenge this finding on appeal.

Hallberg's written offer to settle the plaintiff's claims relating to the unauthorized dumping on the property contained three options: (1) setting up a processing operation on site to prepare the material for resale; (2) a monetary offer to settle for $2500; and (3) allowing Hallberg to remove approximately thirty truckloads of dumped material from the plaintiff's property. In its special defense alleging failure to mitigate damages, the defendant raised a claim related only to the plaintiff's failure to allow Hallberg to remove the material. Accordingly, that option alone is relevant in the present case.

The plaintiff commenced the present action after obtaining the requisite authorization from the Office of the Claims Commissioner pursuant to General Statutes § 4-160.

Brian Conte, the plaintiff's witness, testified as an expert in the fields of hydrogeology and environmental consulting. Douglas Martin, the defendant's witness, testified as an expert in the field of environmental site assessment remediation.

Conte also produced a second scenario, which involved the removal of 225 truckloads of material spread over the entire property, at a cost of $483,864. Because the trial court ultimately found that Hallberg was responsible for depositing only thirty-two truckloads, this scenario was rejected by the trial court. See footnote 2 of this opinion.

The plaintiff's expert, Conte, testified as follows on cross-examination by the defendant's counsel:
"Q. What type of material would [the high level facility] accept?
"A. ... [S]oil with bulky waste that's less than two inches.
"Q. And ... what does [the low level facility] take?
"A. [The low level facility] would take lightly polluted soil that doesn't have ... bulky materials in it-anything but soil-and actually use it for covering of a landfill ...."

The trial court was referring to separate civil actions related to this matter that were brought by the plaintiff against various other defendants.

The plaintiff's expert, Conte, testified as follows on cross-examination by the defendant's counsel:
"Q. If Hallberg had removed the [thirty-two] truckloads of material that [it] deposited on the property back in 2006 or 2007, would there be a need for any of these costs ...?
"A. That removal would address [the removal of the thirty-two truckloads] but would not address the other soil piles well above what the [thirty-two] truckloads were.
"Q. So is your answer that, no, it wouldn't be necessary?
"A. So [the thirty-two truckloads] would be taken care of. In other words the [thirty-two] truckloads would be removed ...."

At oral argument before this court, the plaintiff claimed that, rather than accept Hallberg's offer, it chose to mitigate its damages by marketing the property for sale "as is," thereby transferring the cost of cleaning up the property to a subsequent owner. A review of the record indicates that the plaintiff did not make this argument in its brief. Because this argument was presented for the first time at oral argument, we decline to consider it. See, e.g., Grimm v. Grimm , 276 Conn. 377, 393, 886 A.2d 391 (2005) ("[i]t is well settled that claims on appeal must be adequately briefed, and cannot be raised for the first time at oral argument before the reviewing court"), cert. denied, 547 U.S. 1148, 126 S.Ct. 2296, 164 L.Ed.2d 815 (2006).

In its memorandum of decision, the trial court explained: "For all of these reasons , the plaintiff did not prove that the [defendant's] authorization permitting Hallberg to dump caused the plaintiff to lose the benefit of its bargain when the Bow Tie sale did not go through." (Emphasis added.)

Specifically, the following colloquy occurred between Serkes and the defendant's counsel:
"Q. So [the plaintiff] chose not to spend the money [to clean up the property as required in the contract]?
"A. No. It was several hundred thousand dollars, and we were not prepared to do that because there was no guarantee that it would close, you know, if we were to do that."

In its brief, the plaintiff argues that, because the trial court found that the defendant breached its duty to the plaintiff by negligently authorizing Hallberg to deposit materials on the property, and because the breach was a proximate cause of the damages proven by the plaintiff during trial, the trial court improperly rejected its claim for lost profits. This argument, however, misconstrues the trial court's findings. As revealed in its memorandum of decision, the trial court found that the defendant's "breach of ... duty was a proximate cause of the damages proven by [the plaintiff]" and that "[the defendant's] negligence proximately damaged the property." The trial court determined, and indeed we affirm, that the defendant's breach was a proximate cause of the damage to the property. The trial court, however, did not find that the breach was a proximate cause of the plaintiff's lost profits. Therefore, lost profits are not damages that were proven by the plaintiff.