******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# MARY DOE ET AL. *v.* DEPARTMENT OF MENTAL HEALTH AND ADDICTION SERVICES ET AL.
## (AC 40190)

Elgo, Bright and Moll, Js.

*Syllabus*

The plaintiffs, M and her conservator, J, brought this action against the defendants for alleged violations of the patients' bill of rights (§ 17a-540 et seq.) in connection with M's treatment and confinement at the defendant forensic psychiatric hospital. The plaintiffs claimed, inter alia, that M's commitment as the only woman in an otherwise all male maximum security unit at the hospital was a per se violation of the patients' bill of rights, and violated her right to "humane and dignified treatment" pursuant to § 17a-542. The trial court rendered judgment in favor of the defendants, from which the plaintiffs appealed to this court. *Held*:

1. The trial court properly concluded that the civil commitment of M, as the only woman in an otherwise all male maximum security unit at the hospital, was not a per se violation of the patients' bill of rights; notwithstanding the remedial purpose and significant provisions of the patients' bill of rights, it does not mandate that committed patients be subject to categorical gender segregation, the plaintiffs failed to provide any authority in support of their claim that the placement of M in the subject unit was per se inhumane and undignified solely because the unit housed only men at the time that she was placed there for treatment, and this court declined to hold that dual gender confinement in the unit was per se inhumane and undignified, as it would have been imprudent for this court to graft, by judicial fiat, an unqualified mandate onto the patients' bill of rights where no such rule exists, the legislature could have imposed such a rule but has not done so, whether such a placement violates the patients' bill of rights is necessarily contingent on the factual circumstances, including the reasons for the placement, and the imposition of a per se rule would be inconsistent with the purpose of the patients' bill of rights, which was intended to remedy the then prevailing conditions of our mental health institutions and to ensure the fair treatment of patients by, in part, imposing a mandatory requirement of a specialized treatment plan.

2. The plaintiffs could not prevail on their claim that the trial court improperly applied the standard outlined in *Mahoney* v. *Lensink* (213 Conn. 548) to determine that the defendants' treatment of M while she was committed to the maximum security unit did not violate her right to humane and dignified treatment under § 17a-542: contrary to the claim of the plaintiffs, *Mahoney* makes clear that the right to a specialized treatment plan is part of, and not severable from, the right to humane and dignified treatment and, thus, the standard for a violation of § 17a-542, as outlined by *Mahoney*, is not only applicable to a claim that there was a failure to develop a specialized treatment plan, but also is applicable to a claim that the patient did not receive humane and dignified treatment; accordingly, the trial court properly applied the *Mahoney* standard to conclude that the defendants' treatment of M was not inhumane and undignified, as the defendants' treatment plan was permissible and reasonable in view of the severity and resistant nature of M's medical condition and in light of her diagnosis, the defendants made a good faith effort to remedy M's hygiene in that they assigned her to the only room with a half bathroom, offered her privacy when she needed to take a shower in the unit, and brought her special toilet articles, the defendants made a good faith effort to engage M in activities outside the unit, where she would be able to socialize with other female patients, and in view of M's prior history of secreting sharp items and the mandatory policy of the hospital, two strip searches of M that were conducted, although traumatizing, were a permissible and reasonable part of her treatment.

Argued December 10, 2018—officially released March 12, 2019

Action to recover damages for the defendants' alleged violations of the patients' bill of rights in connection with the named plaintiff's treatment and confinement at a forensic psychiatric hospital, brought to the Superior Court in the judicial district of Litchfield and tried to the court, *Schuman, J.*; judgment in favor of the defendants, from which the plaintiffs appealed to this court. *Affirmed.*

*Lisa M. Vincent*, for the appellants (plaintiffs).

*Ralph E. Urban*, assistant attorney general, for the appellees (defendants).

*Opinion*

BRIGHT, J. The plaintiffs, Mary Doe and her conservator Jane Doe,[1] appeal from the judgment of the trial court, rendered after a trial to the court, in favor of the defendants, the Department of Mental Health and Addiction Services, Connecticut Valley Hospital, and Whiting Forensic Division of Connecticut Valley Hospital (Whiting). On appeal, the plaintiffs claim that the court improperly (1) concluded that the commitment of Mary Doe, as the only woman in an otherwise all male maximum security unit at a forensic psychiatric hospital, was not a per se violation of the statutory bill of rights for psychiatric patients (patients' bill of rights); see General Statutes §§ 17a-540 through 17a-550; and (2) applied the standard outlined by *Mahoney* v. *Lensink*, 213 Conn. 548, 565–68, 569 A.2d 518 (1990), to determine that the defendants' treatment of Mary Doe while she was committed to the maximum security unit had not violated her right to "humane and dignified treatment" under § 17a-542. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. Mary Doe was born in 1970, and she was raised by her great aunt because her parents essentially were absent from her early life. Mary Doe's childhood and adolescence were "chaotic, unpredictable, and dangerous, often requiring intensive mental health treatment and containment." She was raped when she was eleven or twelve years old, and she may have been subject to another incident of sexual abuse thereafter. Between the ages of twelve and nineteen, Mary Doe committed physical acts of violence against a male student, two teenage girls, and her family members. She subsequently was diagnosed with "schizophrenia, paranoid type," and, at age nineteen, she was admitted to Connecticut Valley Hospital for the first time. Over the next twenty years, Mary Doe committed seventy-nine reported assaults, some of which were "very serious," involving "dangerous instruments," such as "knives, plastic utensils, a broken CD, and broken radio antennae." In connection with these incidents, Mary Doe was arrested numerous times "and then examined and treated for lack of competency to stand trial." In 2007, Jane Doe became Mary Doe's conservator.

Between 1992 and 2008, Mary Doe intermittently was committed to Whiting, which is the only forensic psychiatric hospital in Connecticut. Whiting has a capacity of "somewhere between [ninety-one] and 110 beds." While committed between 1992 and 2008, Mary Doe "exhibited difficult behaviors such as paranoid delusions, resistance to taking medications, poor hygiene and lack of showering, making crude comments and accusations about sex, urinating in common areas, throwing liquids and other items, hoarding of items, and, at least at one

point, expressing a suicidal intent."

In 2008, Mary Doe involuntarily was committed pursuant to an order of the Probate Court and, consequently, she was placed in unit 6 at Whiting on December 24, 2008. Unit 6 is a maximum security unit with an approximate capacity of twelve persons. Unit 6 is a "highly specialized section for patients," like Mary Doe, "who had a history of trauma, psychotic episodes, and serious impairment. No other unit at Whiting could provide such treatment." Her admission diagnosis included, among other things, "schizophrenia, paranoid type, post-traumatic stress disorder, borderline intellectual functioning, type two diabetes, [and] seizure disorder . . . ." Mary Doe resided in unit 6 until January 30, 2011, when she was discharged from Whiting and began living in Jane Doe's residence with supervision from the staff of Community Systems, Inc. (Community Systems). After she assaulted Jane Doe's husband and two Community Systems staff members, Mary Doe involuntarily was committed pursuant to an order of the Probate Court. Mary Doe then resided in unit 6 from April 6, 2011 through May 18, 2012. Thereafter, Mary Doe again was discharged from Whiting and, after approximately four years, she returned to Whiting, where she currently resides.[2] Mary Doe was the only female who resided in unit 6 during the operative periods between 2010 and 2012.

On April 23, 2013, the plaintiffs, pursuant to § 17a-550,[3] filed the present civil action against the defendants seeking monetary damages. In the operative amended complaint, dated June 15, 2014, the plaintiffs alleged that the defendants were responsible for the "diagnosis, observation, or treatment of persons with psychiatric disabilities . . . ." They also alleged, in relevant part, that from April 25, 2010 through January 29, 2011,[4] and from April 6, 2011 through May 18, 2012, the defendants' placement of Mary Doe in the otherwise all male unit 6, as well as the defendants' treatment of Mary Doe while in unit 6, caused the "dehumanization and degradation" of Mary Doe in violation of § 17a-542.

On February 17, 2017, after a three day trial, the court issued a memorandum of decision in which it rendered judgment in favor of the defendants on the plaintiffs' complaint. The court concluded that the placement of Mary Doe in the otherwise all male unit 6 was not a per se violation of her right to humane and dignified treatment pursuant to the patients' bill of rights. The court also concluded, pursuant to the standard set forth in *Mahoney* v. *Lensink*, supra, 213 Conn. 565–68, that the treatment of Mary Doe while she was confined in unit 6 was not inhumane and undignified in violation of § 17a-542.[5] This appeal followed. Additional facts will be set forth as necessary.

Before turning to the merits of the plaintiffs' claims, we briefly set forth the applicable standard of review.

"The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Sun Val, LLC* v. *Commissioner of Transportation*, 330 Conn. 316, 325–26, 193 A.3d 1192 (2018); *Hartford* v. *CBV Parking Hartford, LLC*, 330 Conn. 200, 214, 192 A.3d 406 (2018) ("[w]hether the trial court applied the proper legal standard is subject to plenary review on appeal"). On appeal, the plaintiffs do not contest any of the factual findings of the court; instead, their claims challenge the court's conclusions of law and application of the proper legal standard. Accordingly, our review of both of the plaintiffs' claims is plenary.

I

The plaintiffs first claim that, contrary to the court's conclusion, the defendants' placement of Mary Doe in the otherwise all male unit 6 was per se inhumane and undignified and, thus, constituted a violation of the patients' bill of rights. We disagree.

"The provisions of the [patients'] bill of rights . . . are significant. They include not just the protection of a patient's personal, property [and] civil rights; General Statutes § 17a-541; rights to communicate by mail and telephone and to receive visitors; General Statutes §§ 17a-546 and 17a-547; and qualified rights to refuse the administration of medication and certain treatment; General Statutes § 17a-543; but also include a positive, meaningful right to treatment, consistent with the requirements of good medical practice, in other words, not only basic custodial care but also an individualized effort to help each patient by formulating, administering and monitoring a specialized treatment plan as expressly mandated by [§ 17a-542]." (Footnote omitted; internal quotation marks omitted.) *State* v. *Anderson*, 319 Conn. 288, 315–16, 127 A.3d 100 (2015). These provisions "illuminate the breadth of the legislative concern for the fair treatment of mental patients." *Mahoney* v. *Lensink*, supra, 213 Conn. 556, 559 (patients' bill of rights "was intended to remedy the then prevailing conditions at state mental health facilities"). In particular, the plaintiffs rely on § 17a-542, which provides in relevant part: "Every patient treated in any facility for treatment of persons with psychiatric disabilities shall receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy. Each patient shall be treated in accordance with a specialized treatment plan suited to his disorder. . . ."

Notwithstanding the remedial purpose and significant provisions of the patients' bill of rights, it does not mandate that committed patients be subject to categorical gender segregation. Further, the plaintiffs fail to direct us to any precedent that supports their contention that the placement of Mary Doe in unit 6 was per se inhumane and undignified solely because the unit housed only men at the time that she was placed there for treatment, and we are aware of none. The plaintiffs recognize this deficiency, but, nevertheless, they advocate that this court hold, as a matter of law, that the placement of a female in an otherwise all male maximum security unit at a forensic psychiatric hospital is per se inhumane and undignified and, thus, constitutes a violation of the patients' bill of rights. We decline to do so for the following reasons.

First, it would be imprudent for this court to graft, by judicial fiat, an unqualified mandate onto the patients' bill of rights where no such rule exists. "We are not in the business of writing statutes; that is the province of the legislature. Our role is to interpret statutes as they are written. . . . [We] cannot, by [judicial] construction, read into statutes provisions [that] are not clearly stated." (Internal quotation marks omitted.) *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 412, 999 A.2d 682 (2010). If the legislature wanted to impose an absolute rule mandating the gender segregation of patients committed to a maximum security unit at a psychiatric hospital, it could have done so. In the absence of such a mandate, we decline to hold that dual gender confinement in unit 6 is a per se violation of the patients' bill of rights.

Second, the humane and dignified treatment standard cannot be reduced to a bright line rule in this context. When asked at oral argument before this court to articulate the confines of the proposed per se rule, the plaintiffs' counsel agreed that coed housing of patients, by itself, is not a per se violation of the statute. Other than saying that a single woman in a ward with more than one man is impermissible, counsel was unable to articulate sufficiently the female to male ratio that would constitute a per se violation. In addition, counsel pointed to other factors, such as whether the unit was locked and whether there were sufficient bathroom facilities for each sex, as affecting the determination of whether the housing is "per se" illegal. These responses, as well as the plaintiffs' reliance on the fact that Mary Doe, as a victim of sexual assault, was particularly afraid of violent men, like those housed in unit 6, demonstrate the necessity for a fact intensive inquiry to determine whether the placement of a female in an otherwise all male ward constitutes inhumane and undignified treatment. Whether such a placement is violative of the patients' bill of rights is necessarily contingent on the factual circumstances, including the reasons for place-

ment in unit 6, the treatment capabilities of unit 6, available alternatives to unit 6, the patient's psychological history, and the patient's specific conditions of confinement in unit 6. Furthermore, a per se rule is incompatible with the standard applicable to determining whether the patients' bill of rights has been violated, which, as described in part II of this opinion, is at least partially dependent on whether the "treatment plan was permissible and *reasonable in view of the relevant information available* . . . ." (Emphasis added.) *Mahoney* v. *Lensink*, supra, 213 Conn. 566.

Third, the imposition of the plaintiffs' per se rule would be inconsistent with the purpose of the patients' bill of rights. As outlined previously in this opinion, the patients' bill of rights was intended to remedy the then prevailing conditions of our mental health institutions and to ensure the fair treatment of mental patients by, in part, imposing a mandatory requirement of a specialized treatment plan. See id., 565–68. If, as the plaintiffs propose, a female may never be placed in unit 6 with all males, regardless of circumstance, that restriction would narrow the treatment options available to females.[6] As a result, the proposed per se rule would prohibit the assignment of a female to an otherwise all male unit 6, even if that assignment is a component of the most appropriate specialized treatment plan. Furthermore, the per se rule potentially would have a negative impact on the fair treatment of other patients confined at Whiting, who also are entitled to humane and dignified treatment as part of a specialized treatment plan, if the defendants are constrained from relocating a patient with dangerous propensities, like Mary Doe, to unit 6.

On the basis of the foregoing, we reject the plaintiffs' proffered per se rule and, accordingly, conclude that the court properly determined that the civil commitment of Mary Doe, as the only woman in an otherwise all male maximum security unit at a forensic psychiatric hospital, was not a per se violation of the patients' bill of rights.

II

The plaintiffs also claim that the court improperly applied the standard outlined by *Mahoney* v. *Lensink*, supra, 213 Conn. 565–68, to determine that the defendants' treatment of Mary Doe while she was committed to the maximum security unit did not violate her right to "humane and dignified treatment" under § 17a-542. In particular, the plaintiffs argue that the standard articulated by *Mahoney* is inapplicable to their claim, which relies solely on the mandate of § 17a-542 that patients receive "humane and dignified treatment," because they assert that *Mahoney* considered only the purportedly distinct mandate of § 17a-542 that a patient "be treated in accordance with a specialized treatment plan suited to his disorder." They argue that the court erred in

applying *Mahoney* to their humane and dignified treatment claim. We disagree.

In *Mahoney*, our Supreme Court considered, in relevant part, whether the plaintiffs' complaint sufficiently stated "a cause of action for deprivation of the right to humane and dignified treatment that [General Statutes] § 17-206c, [now § 17a-542],[7] guarantees to every patient in state mental hospitals." (Footnote added; internal quotation marks omitted.) Id., 562. In making that determination, our Supreme Court began with an examination of the relevant statutory language and recognized that "[s]ince the legislature chose not to attach a statutory definition to the phrase 'humane and dignified treatment,' we must interpret this language in light of the established canons of statutory construction." Id., 563. After reviewing a report composed by a task force, our Supreme Court concluded that "[i]n its adoption of a statutory right to humane and dignified treatment, the legislature intended to afford patients a meaningful right to treatment, consistent with the requirements of good medical practice." Id., 565. The court, relying on several medical treatises, held that "[m]eaningful treatment . . . requires not only basic custodial care but also an individualized effort to help each patient by formulating, administering and monitoring a 'specialized treatment plan' as expressly mandated by § 17-206c." Id.

Our Supreme Court then pronounced the following standard applicable to claims alleging a violation of § 17-206c: "The statutory responsibility for the formulation and subsequent monitoring of an appropriate treatment plan for each patient does not, however, encompass a guarantee that the treatment plan will invariably produce the desired results. A poor outcome may occur despite the best possible medical practice. . . . The standard for determining whether the provisions of § 17-206c have been violated thus cannot depend on the outcome of treatment. . . .

"To recover for a violation of the statute, a plaintiff must prove, as the statute prescribes . . . that the conditions of his hospitalization were statutorily deficient. The plaintiff must allege and prove that the hospital failed initially to provide, or thereafter appropriately to monitor, an individualized treatment suitable to his psychiatric circumstances. In assessing whether the plaintiff has met his burden of proof, the trier of fact must inquire not whether the hospital has made the best decision possible but rather whether its treatment plan was permissible and reasonable in view of the relevant information available and within a broad range of discretion. . . . The issue, under § 17-206c is whether the hospital made good faith efforts to improve the patient's mental health and not whether it succeeded in fulfillment of this goal." (Citations omitted; footnotes omitted.) Id., 565–67.

The plaintiffs interpret the foregoing standard outlined by *Mahoney* as applicable only to the right to a specialized treatment plan, which is set forth in the second sentence of § 17a-542, and not applicable to the right to humane and dignified treatment, which they claim is a separate and independent obligation set forth in the first sentence of § 17a-542. We disagree.

The first two sentences of § 17a-542 provide: "Every patient treated in any facility for treatment of persons with psychiatric disabilities shall receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy. Each patient shall be treated in accordance with a specialized treatment plan suited to his disorder." The language of the first sentence makes clear that all psychiatric patients are entitled to humane and dignified treatment for their disabilities. The second sentence then provides that such treatment must be pursuant to a specialized treatment plan. Thus, the two sentences work in concert to create a single requirement—the creation of a specialized treatment plan that is at all times humane and dignified, with full respect for the patient's personal dignity and right to privacy. This requirement applies not only to the medical treatment provided pursuant to the plan, but also to the custodial setting in which it is provided.

Our Supreme Court discussed the unified nature of the obligation created by § 17a-542 in *Mahoney*. At the outset of its analysis, our Supreme Court specifically stated that it sought to interpret the phrase "humane and dignified treatment," as utilized by what is now § 17a-542. Id., 563. It then reasoned that the phrase was intended to mean a "meaningful right to treatment, consistent with the requirements of good medical practice." Id., 565. The court thus confirmed that whether the patient is treated humanely and with dignity must be determined in the context of the medical treatment that the patient receives. The court then made clear that the patient's living conditions cannot be divorced from the medical treatment that the patient receives. "Meaningful treatment thus requires not only basic custodial care but also an individualized effort to help each patient by formulating, administering and monitoring a 'specialized treatment plan' as expressly mandated by [§ 17a-542]." Id.

*Mahoney* thus makes clear that the right to a specialized treatment plan is part of, and not severable from, the right to humane and dignified treatment. This interpretation is bolstered by our Supreme Court's use of broad language to outline that the standard is applicable to "a violation of the statute," as opposed to precise language specifically delineating that the standard was applicable to only one part of the statute. Id., 566; see also *State* v. *Anderson*, supra, 319 Conn. 315–16 (reaffirming principles of *Mahoney*). Accordingly, the stan-

dard for a violation of § 17a-542, as outlined by *Mahoney*, is not only applicable to a claim that there was a failure to develop a specialized treatment plan; rather, it also is applicable to a claim that the patient did not receive humane and dignified treatment.

In the present case, the court considered each of the plaintiffs' claims that Mary Doe had not received humane and dignified treatment. First, the plaintiffs alleged that Mary Doe "did not have privacy for hygiene and other needs, [and] that she suffered from being on an otherwise all male ward," and, second, the plaintiffs alleged "that she was subject to strip searches." The court made the following findings of fact in connection with each part of the plaintiffs' claim.

As to the first part of their claim, the court found that Mary Doe periodically would not shower and refused to shower in other units, "appeared disheveled" and wore multiple layers "to conceal her femininity," had stuffed paper in her ears to muffle the noise from the unit, and had "often made sexually oriented remarks, sometimes inviting the staff to engage in sexual acts with her, and expressed a fear of men and of being raped." The court also made findings as to Mary Doe's medical condition, including that she "fell within the one third of psychosis patients who are resistant to treatment," and that she "has a delusional preoccupation with being raped and murdered regardless of her setting," which was not caused by her placement in unit 6, but, rather, is a "symptom of her schizophrenia and complicates the sexual trauma she experienced earlier in her life." (Internal quotation marks omitted.) Further, the court relied on the testimony of one of Mary Doe's psychiatrists that she was "grossly psychotic, long-term treatment resistant, and the second most dangerous and one of the most challenging patients in his thirty year career." (Internal quotation marks omitted.)

The court also found that "[t]he staff at Whiting truly cared for [Mary Doe] and tried their best to accommodate her needs. At first, their primary concern was admittedly not hygiene but rather [her] safety and the safety of the staff and other patients. Although it may have proved difficult to free [Mary Doe] completely of her fear for her safety, fortunately there was not one incident of violence against her during the complaint period. Further, with regard to hygiene, the staff provided her the only room in the unit with a half bathroom, offered her privacy when taking a shower in the unit facility, and even bought her special toilet articles to entice her to clean herself. There was noise on the unit, but that noise is perhaps endemic to a maximum security unit in a psychiatric hospital. The staff tried to engage [her] in activities outside the unit such as walking in the courtyard or going to the gym. There, [Mary Doe] could socialize with other female patients.

[Mary Doe's] behavior and appearance improved towards the end of her stays at Whiting. That outcome is at least partly the result of her treatment." (Footnote omitted.) Indeed, "the court did not find a single instance of bad faith on the part of the defendants."

As to the second part of the plaintiffs' claim, the court found that Mary Doe "was strip searched on two occasions," at least one of which "was a traumatic experience for [her]." It also found that "[w]hile it is hard to describe any strip search in itself as humane and dignified, strip searches were a necessary part of [Mary Doe's] institutionalization," as mandated by Whiting policy for all patients who left the institutional grounds unsupervised. "Moreover, [Mary Doe] had a prior history of secreting sharp items—on one occasion attempting to bring one into the institution—and of using dangerous items in assaultive attacks. Thus, a strip search had a particular justification in [Mary Doe's] case. Finally, the evidence suggested that female officers conducted the strip searches of [Mary Doe] and that no improper conduct by them occurred during those searches." (Footnotes omitted.) Indeed, on one occasion, the required strip search was obviated when agency police accompanied Mary Doe to the hairdresser.

The court then cited *Mahoney* v. *Lensink*, supra, 213 Conn. 566–67, for the propositions that "[t]he standard for determining whether the provisions of § 17-206c have been violated thus cannot depend on the outcome of treatment," and "[t]he issue, under § 17-206c, is whether the hospital made good faith efforts to improve the patient's mental health and not whether it succeeded in fulfillment of this goal." (Internal quotation marks omitted.) The court applied the *Mahoney* standard to the foregoing facts and concluded that Mary Doe was not subject to inhumane and undignified treatment while committed to unit 6.

On the basis of these findings, which are uncontested on appeal, we conclude that the court properly applied the *Mahoney* standard to conclude that the defendants' treatment of Mary Doe was not inhumane and undignified. The defendants' treatment plan was permissible and reasonable in view of the severity and resistant nature of Mary Doe's medical condition, which transcends her commitment to unit 6. In light of her diagnosis, the defendants made a good faith effort to remedy Mary Doe's hygiene in that they assigned her to the only room with a half bathroom, offered her privacy when she needed to take a shower in the unit, and brought her special toilet articles. As for the noise that is inherent in unit 6 and Mary Doe's fear of men, the defendants made a good faith effort by engaging her in activities outside unit 6, where she would be able to socialize with other female patients, and, importantly, there was no incident of violence against her. Further-

more, although the ultimate success of the treatment is not the touchstone of the *Mahoney* standard, it is instructive that Mary Doe's behavior and appearance improved toward the end of the periods during which she was committed to unit 6.

Likewise, in view of the mandatory Whiting policy and Mary Doe's prior history of secreting sharp items, the two strip searches, although traumatizing, were a permissible and reasonable part of her treatment. The court's findings establish that the defendants made a good faith effort to diminish this negative effect on Mary Doe by accompanying her off of the premises, which obviated the need for a strip search, and by utilizing female officers to conduct the strip searches when a search was required. In addition, the court's unchallenged findings that the "staff at Whiting truly cared for [Mary Doe] and tried their best to accommodate her needs," that the defendants' primary concern was safety, and that there was no instance of bad faith on behalf of the defendants, compel the conclusion that the defendants did not subject Mary Doe to inhumane and undignified treatment. Therefore, we conclude that the court properly applied the *Mahoney* standard to determine that the defendants' treatment of Mary Doe while she was committed to unit 6 did not violate her right to "humane and dignified treatment" under § 17a-542.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The trial court granted the plaintiffs permission to use pseudonyms for purposes of bringing this action.

[2] The plaintiffs' complaint makes no claim regarding Mary Doe's current commitment and the trial court made no factual findings regarding her current commitment; thus, such information is not necessary to a resolution of the plaintiffs' claims on appeal.

[3] General Statutes § 17a-550 provides: "Any person aggrieved by a violation of sections 17a-540 to 17a-549, inclusive, may petition the superior court within whose jurisdiction the person is or resides for appropriate relief, including temporary and permanent injunctions, or may bring a civil action for damages."

[4] On March 19, 2014, the court dismissed "any claim alleged to have occurred prior to April 25, 2010," as barred by the three year statute of limitations contained in General Statutes § 52-577. The plaintiffs do not challenge that ruling in this appeal.

[5] The court also concluded that the defendants did not violate the specialized treatment plan provision of § 17a-542 by failing to create a treatment plan suitable to Mary Doe's needs, and that the defendants did not violate the proscription of § 17a-544 (b) that "[m]edication shall not be used as a substitute for [a] habilitation program." Neither of these conclusions is challenged on appeal.

[6] Likewise, we recognize the general principle of deference to decisions made by qualified professionals regarding a patient who has been involuntarily committed to a state institution. See *Youngberg* v. *Romeo*, 457 U.S. 307, 322–23 and n.29, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) ("there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions").

[7] Although § 17-206c, as interpreted by *Mahoney* v. *Lensink*, supra, 213 Conn. 563–68, has been the subject of subsequent technical amendments and was recodified at § 17a-542, the substantive provisions of § 17-206c remain materially unchanged from the provisions of § 17a-542.